Argued and submitted January 31, complaint dismissed July 9, 1985

In re Complaint as to the Conduct of

# GERALD M. CHASE,

*Accused.*

(SC 29057)

702 P2d 1082

Richard L. Weil, Portland, argued the cause and filed the briefs for accused.

Patric J. Doherty, Portland, argued the cause for Oregon State Bar. On the brief were Dennis R. VavRosky, Bruce A. Gunter and Rankin, McMurry, VavRosky & Doherty, Portland.

Before Peterson, Chief Justice, Lent, Linde, Campbell, Roberts and Carson, Justices.

PER CURIAM

Peterson, C. J., dissented and filed an opinion.

Lent, J., dissented and filed an opinion.

## PER CURIAM

The accused was convicted of attempted possession of a controlled substance, a misdemeanor. ORS 475.992(4)(b) and ORS 161.405(1). The Bar brought these disciplinary proceedings alleging that the misdemeanor involved moral turpitude. ORS 9.527(2) (set forth *infra*).[1] Two members of the Trial Board concluded that the crime did not involve moral turpitude. The other member dissented. The Disciplinary Review Board was also divided and by a four to three vote found the crime to be one involving moral turpitude and recommended a public reprimand.

The following facts are set out here from the Trial Board's Findings of Fact.

"On June 28, 1982, while waiting outside of Washington County Circuit Court Judge Alan Bonebrake's office to see the judge, the accused, Gerald M. Chase, got up from his seat and was seen to drop a matchbox and cigarette rolling papers. Judge Bonebrake's secretary, Harlene Crossen, and three other witnesses, Carole Robertson, Frank Rozales, and Bruce Johnson, all observed those items fall from the accused's pocket. The matchbox was later discovered to contain .27 grams of cocaine. A special prosecutor was called in to handle the case. Mr. Chase was charged with and pled guilty to Attempted Possession of a Controlled Substance (cocaine). This is a Class A Misdemeanor.

"Mr. Chase testified that he was given the cocaine in a matchbox by an in-law in Seattle, had left it in his automobile, and did not know the cocaine was in his possession when it fell from his clothing. He testified that he had put a matchbox in his pocket thinking it contained matches.

The accused, in arguing that the attempted possession of a controlled substance is not a misdemeanor involving moral turpitude, relies on an often quoted definition of moral turpitude as comprising "an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow man, or to society in general, contrary to the accepted and customary rule of right and duty between man and man." *Ex parte Mason*, 29 Or 18, 21, 43 P 651 (1896), quoting Newell, *Defamation, Slander, and Libel*, § 12; *see also*

---

[1] The Bar and the accused refer to ORS 9.480(2) rather than ORS 9.527(2). ORS 9.480(2) was amended in a minor fashion in 1981 and renumbered.

*In re Piper,* 271 Or 726, 534 P2d 159 (1975); *State ex rel Ricco v. Biggs,* 198 Or 413, 255 P2d 1055 (1953); *Ruble v. Kirkwood,* 125 Or 316, 266 P 252 (1928). The accused elaborates that the intentional or knowing violation of any law by an attorney, does not, in and of itself, constitute an act of moral turpitude. Rather, he argues that the existence of moral turpitude depends on the underlying facts and circumstances as found in each individual case. The Bar, on the other hand, describes moral turpitude as "anything done contrary to justice, honesty, principle or good morals." *State v. Edmunson,* 103 Or 243, 246, 204 P 619 (1922). The parties apparently see a distinction in the definitions; however, if there is a distinction it is not significant for this case.[2]

The Bar's position is that because the attempt statute, ORS 161.405(1),[3] requires intentional conduct constituting a substantial step toward the commission of a crime, a lawyer who takes this step toward the commission of the felony of possession of a controlled substance should be found guilty of committing a misdemeanor involving moral turpitude.

The problem presented in this case and another case decided this date, *In re Drakulich,* 299 Or 417, 702 P2d 1097 (1985), is the establishment of the proper criteria to determine whether a misdemeanor involves moral turpitude. The two cases before us illustrate the inconsistencies that can result when the definition hinges on the circumstances of individual cases. Both attorneys were convicted of the attempted possession of a controlled substance (cocaine). In the instant case the Disciplinary Review Board determined that the misdemeanor involved moral turpitude; in the other it concluded that the misdemeanor did not.

We are called upon to interpret a statutory term, moral turpitude, found in ORS 9.527(2). Conviction of actual possession, a felony, ORS 475.992(4)(b), would be grounds for

---

[2] At least one case had combined the two definitions relied on by the parties here. *Attorney Griev Comm'n v. Andresen,* 281 Md 152, 157, 379 A2d 159 (1977).

[3] ORS 161.405(1) provides:

"A person is guilty of an attempt to commit a crime when he intentionally engages in conduct which constitutes a substantial step toward commission of the crime."

discipline irrespective of moral turpitude. But because attempted possession is only a misdemeanor, it must involve moral turpitude. We are not free to impose our own judgment of the propriety of the conduct for which the accused was convicted. Our task, rather, is to discern the legislature's meaning. Whether some other statute or rule authorizing discipline may reach the accused's conduct is not before us.[4]

## I

ORS 9.527, which authorizes this court to discipline bar members, provides, in relevant part:

"The Supreme Court may disbar, suspend or reprimand a member of the bar whenever, upon proper proceedings for that purpose, it appears to the court that:

"* * * * *

"(2) The member has been convicted in any jurisdiction of an offense which is a misdemeanor involving moral turpitude or a felony under the laws of this state, or is punishable by death or imprisonment under the laws of the United States, in any of which cases the record of the conviction shall be conclusive evidence * * *."[5]

---

[4] For example, ORS 9.527(1) provides:

"The Supreme Court may disbar, suspend or reprimand a member of the bar whenever, upon proper proceedings for that purpose, it appears to the court that:

"(1) The member has committed an act or carried on a course of conduct of such nature that, if the member were applying for admission to the bar, the application should be denied."

ORS 9.220, which regulates admission as an attorney, provides, in relevant part:

"An applicant for admission as attorney must apply to the Supreme Court and show that the applicant:

"(1) Is a resident of this state, and at least 18 years old, which proof may be made by the applicant's affidavit.

"(2)(a) Is a person of good moral character.

"(b) For purposes of this section and ORS 9.025, 9.070, 9.110, 9.130, 9.210, 9.250, 9.527 and 9.545, the lack of 'good moral character' may be established by reference to acts or conduct that reflect moral turpitude or to acts or conduct which would cause a reasonable person to have substantial doubts about the individual's honesty, fairness and respect for the rights of others and for the laws of the state and nation. The conduct or acts in question should be rationally connected to the applicant's fitness to practice law."

We express no view of the effect of these provisions on a case like the present one.

[5] Judges are subject to removal, suspension or censure on the same grounds by the terms of Article VII (Amended), section 8, Oregon Constitution.

Legislative standards for the morality of attorneys have existed in this country since colonial times. "Educational standards came and went, but, at least after the colonial period, virtue remained a constant prerequisite, in form if not in fact." Rhode, *Moral Character as a Professional Credential,* 94 Yale L Rev 491, 496 (1985). The language of ORS 9.527(2) has been a part of our attorney discipline statue since 1862. General Laws of Oregon, ch 14, § 1015, p 402 (Deady 1845-1864). The statute has been amended or renumbered on occasion but the legislature has not altered or explained the statutory term. We must attribute to the legislature an intelligent understanding of what crimes fit within this category.

One commentator explains:

"At common law, this term was rarely used to distinguish between more and less heinous crimes. The classifications in vogue included felony and misdemeanor, crimes *mala in se* and *mala prohibita, crimen falsi,* and infamous crimes. Uncertain connotation, conflicting precedent, and unsuccessful redefinition made these categories objectionable. Legislators called upon to draft civil statutes that referred to criminal offenses needed a classification less tenuous. Instead of cataloguing the separate crimes at which their enactments were directed, they employed the general term, 'crimes involving moral turpitude.' It is not clear whether this established a new criterion, or was merely a synthesis of previously recognized distinctions; at any rate, the phrase has been widely employed, in legislation dealing with immigration, disbarment, revocation of physicians' licenses, defamation, and credibility of witnesses. Note, *Crimes Involving Moral Turpitude,* 43 Harv L Rev 117, 118 (1929-30). (Footnotes omitted.)[6]

Courts from other jurisdictions have developed two methods to define moral turpitude. One is a variable standard

---

[6] The federal Supreme Court noted that the "moral turpitude" has been a statutory standard in many contexts including the deportation of aliens, the disbarment of attorneys, revocation of medical licenses, disqualification and impeachment of witnesses, determining the measure of contribution between joint tort-feasors, and deciding whether certain language is slanderous. *Jordon v. De George,* 341 US 223, 227, 71 S Ct 703, 95 LEd 886 (1951). A recent federal Supreme Court case *Hunter v. Underwood,* 471 US ____, 105 S Ct 1916, 85 LEd 2d 222 (1985), illustrates another use of the term. The Alabama Constitution contained a provision disenfranchising persons convicted of crimes involving moral turpitude. The court struck down the provision as a violation of equal protection. The court did not consider a definition for the term.

which considers the circumstances of each case. The same crime may or may not be one of moral turpitude, depending on conduct in the individual case. *See In re Calaway,* 20 Cal 3d 165, 141 Cal Rptr 805, 570 P2d 1223 (1977); *In re Fahey,* 8 Cal 3d 842, 106 Cal Rptr 313, 505 P2d 1369 (1973); *People v. Gibbons,* 157 Colo 357, 403 P2d 434 (1965); *Committee of Legal Ethics v. Scherr,* 149 W Va 721, 143 SE 2d 141 (1965). The other is a fixed definition. The elements of the crime determine whether it involves moral turpitude. The circumstances of the individual case do not alter the determination. *See Searcy v. State Bar of Texas,* 604 SW 2d 256 (Tex Civ App 1980); *Rice v. Alcoholic Beverage Etc. Appeals Bd.,* 89 Cal App 3d 30, 152 Cal Rptr 285 (1979); *State ex rel Oklahoma Bar Ass'n v. Jones,* 566 P2d 130 (Okl 1977); *Fortman v. Aurora Civil Service Commission,* 37 Ill App 3d 548, 346 NE 2d 20 (1976); *Otash v. Bureau of Private Investigators,* 230 Cal App 2d 568, 41 Cal Rptr 263 (1964).

Likewise, in Oregon we have defined moral turpitude with both an analysis dependent on the circumstances of each case and with some attempt at a fixed definition. We have decided our fixed definition cases on the basis of the nature of the crime itself, often applying the common law distinction between a crime *malum in se,* a crime inherently evil and wrong in itself, and a crime *malum prohibitum,* a crime wrong only because it is prohibited by legislation.[7] These cases, all concluding that moral turpitude was involved, include *In re Carstens,* 297 Or 155, 683 P2d 992 (1984) (theft); *In re Mahr,* 276 Or 939, 556 P2d 1359 (1976) (shoplifting); *In re Thomas Graham Walker,* 240 Or 65, 399 P2d 1015 (1965) (violation of federal income tax statute); *State ex rel Ricco v. Biggs, supra,* (keeping a bawdy house); *In re King,* 165 Or 103, 105 P2d 870 (1940) (false swearing); *State v. Edmunson, supra,* (selling intoxicating liquor contrary to prohibition law); *Ex parte Mason, supra,* (criminal libel).

Other Oregon cases take the approach that the facts

---

[7] The meaning of these terms is itself obscure and these distinctions have fallen into disuse. Blackstone provided examples from his era. *Mala in se* crimes included "murder, theft, and perjury; which contract on additional turpitude from being declared unlawful * * *." Illustrations of crimes *mala prohibita* included "exercising trades without serving an apprenticeship thereto, * * * not burying the dead in woollen, * * * not performing the statute-work on the public roads * * *." 1 Blackstone, Commentaries *54, 58 (Lewis ed 1897).

and circumstances surrounding the commission of the crime will be considered in determining whether the misdemeanor involved moral turpitude. These cases begin with *In re Means,* 207 Or 638, 298 P2d 983 (1956) (did not decide if a violation of federal income tax laws involves moral turpitude but considered facts of case). *Means* was followed by *In re Maurice C. Corcoran,* 215 Or 660, 337 P2d 306 (1959) (whether failure to file income taxes involves moral turpitude depends on circumstances; issue not decided). Cases citing the *Corcoran* analysis with approval are *In re William L. Langley,* 217 Or 45, 341 P2d 538 (1959) (whether conviction of district attorney for refusing to inform against and prosecute for violation of gambling statutes involved moral turpitude could not be determined from incomplete record); *In re John W. Pennington,* 220 Or 343, 348 P2d 774 (1960) (evidence in conviction for failing to pay federal taxes and filing of false partnership tax returns established moral turpitude); *In re Alton John Bassett,* 240 Or 284, 401 P2d 33 (1965) (involving felony conviction for filing fraudulent income taxes; misdemeanor not at issue).

Another theme surfaces which emphasizes the duties of a lawyer and the effect of the accused's acts on the profession. *In re Means, supra,* where the accused violated income tax laws that he had a duty to uphold, specifically referred to the "paramount necessity for maintaining high standards of professional conduct," 207 Or at 641. In *In re Claude M. Johns, Jr.,* 212 Or 587, 321 P2d 281 (1958), we said that the failure to file income tax returns was "a grave matter in any case; the more so when the offender is a member of the bar." 212 Or at 593-94. We stated in *In re John W. Pennington, supra:* "[W]e must weigh this conduct on a different scale. We are not operating a reform institution. The court's duty is to compel compliance with the highest standards of conduct imposed on any profession, business or occupation." 220 Or at 347.

■ The term must be examined with reference to the statute from which it derives, a task our prior cases, with few exceptions, failed to undertake. Subsection (2) provides specifically that the record of conviction shall be conclusive evidence of the conviction which may trigger sanctions. We explained in *Ex parte Mason:* "The record of his conviction is made conclusive evidence thereof, so that the production of

such record established his guilt in the disbarment proceedings. The court may, however, go behind the record for the purpose of determining upon the extent or severity of the punishment to be administered." 29 Or at 25. This means that the category of misdemeanors involving moral turpitude is fixed with reference to the nature and elements of the crime and without consideration of the specific circumstances of a case. Interpreting moral turpitude in this way avoids the difficulties of lack of notice and definitional precision which attend the variable, fact-specific alternative.

■ The statute also provides that once an attorney is found to have been convicted of a misdemeanor involving moral turpitude, this court may impose a sanction. Imposition of sanction is discretionary and the decision may be made with consideration of aggravating or mitigating circumstances in the individual case. However, consideration of the facts does not occur until it is determined from the judgment of conviction alone that the misdemeanor involved moral turpitude. *In re Thomas Graham Walker, supra,* summarized the collected opinions in the area and discerned the following pattern: "[T]he facts considered are really used to decide the degree of punishment, not the question of moral turpitude." 240 Or at 66-67.

In summary, our statute provides that moral turpitude has a fixed meaning, and the determination of that category of misdemeanors must be made with reference to the crime and its elements. If the misdemeanor is one involving moral turpitude, the facts and circumstances of an individual case become significant in determining the appropriate sanction.

## II

■ The inquiry now is to identify those elements that the legislature intended would place a misdemeanor into the statutory category. The Bar argues that any intentional violation of law involves moral turpitude. Some cases support this position, *see* cases cited in Note, *Breach of Liquor Law As Involving Moral Turpitude,* 6 Wis L Rev 40 (1930-31), including, to some extent, the Oregon case of *State v. Edmunson, supra.* However, more recent cases have rejected this interpretation. *In re John W. Pennington, supra,* 220 Or at 349; *In re Means, supra,* 207 Or at 640. We agree with the critics of the

Bar's theory that such an interpretation removes the distinction between criminal conduct generally and that which involves moral turpitude. *See* Note, *Moral Turpitude and its Connection With The Infraction of Liquor Laws,* 75 Penn L Rev 357, 358 (1926-27). It would automatically include all crimes requiring intent and knowledge and would exclude only crimes involving recklessness, criminal negligence and strict liability. *See* ORS 161.085(7)-(10). This is not the dividing line the statute appears to make.

Our own cases have not attempted a consistent development of guidelines for future cases. However, we can discern certain common elements in the categories of behavior that this court has held to constitute moral turpitude. Our cases are in agreement that moral turpitude inheres only in an intentional or a knowing crime. *Ex parte Mason, supra,* 29 Or at 22. Untruthfulness was a significant factor in *In re King, supra,* 165 Or at 113. The element of fraud has prompted a finding of moral turpitude. *In re Maurice C. Corcoran, supra,* 215 Or at 663-64. *In re William L. Langley, supra,* 217 Or at 48, emphasized "corrupt motive" in its ruling on moral turpitude. *In re Alton John Bassett, supra,* though not addressing moral turpitude, summarized the elements of the crime for which the accused was convicted which rendered him unfit to practice law. These included knowing and intentional fraudulent conduct undertaken for personal gain. 240 Or at 288.

The federal alien deportation cases present the largest body of law using the fixed definitions of moral turpitude. The federal analysis examines the elements of the crime for which a person is convicted without consideration of mitigating or aggravating circumstances. Although these cases are not uniform in identifying those elements indicating moral turpitude, we find some guiding principles.

The federal cases are in agreement that in order to involve moral turpitude, a crime must require an intentional mental state, *Hirsch v. Immigration & Naturalization Service,* 308 F2d 562 (9th Cir 1962); *Forbes v. Brownell,* 149 F Supp 848 (D DC 1957); *In re Schiano Di Cola,* 7 F Supp 194 (D RI 1934) (lack of intent in negligent or reckless homicide eliminates it from category of crimes involving moral turpitude). The element of fraud or dishonesty will generally place a crime within the definition. *Jordan v. DeGeorge,* 341 US 223, 71 S Ct

703, 95 L Ed 886 (1951) (conspiracy to defraud federal government of taxes); *Lozano-Giron v. Immigration & Naturalization Service,* 506 F2d 1073 (7th Cir 1974) (possession of counterfeit money with intent to defraud); *Winestock v. Immigration and Naturalization Serv.,* 576 F2d 234 (9th Cir 1978) (dealing in counterfeit securities); *Ramirez v. U.S. Immigration & Naturalization Service,* 413 F2d 405 (DC Cir), *cert den* 396 US 929, 90 S Ct 264, 24 L Ed 2d 226 (1969) (false pretenses with intent to defraud); *United States v. Savoretti,* 200 F2d 546 (5th Cir 1952) (forgery and uttering); *United States v. Schlotfeldt,* 109 F2d 106 (7th Cir 1940) (perjury); *United States v. Reimer,* 19 F Supp 719 (DC NY 1937) (embezzlement). Crimes involving violence against another person are also classed as moral turpitude offenses. *DeLucia v. Flagg,* 297 F2d 58 (7th Cir 1961), *cert den* 369 US 837, 82 S Ct 867, 7 L Ed 2d 843 (1962) (unjustified homicide).[8]

Similar elements are reflected in the state cases that consider only the crime itself and not the circumstances of each case. In *Rice v. Alcoholic Beverage Etc. Appeals Bd., supra,* the court indicated that moral turpitude was "inherent in crimes involving fraudulent intent, intentional dishonesty for purposes of personal gain or other corrupt purpose * * *." 89 Cal App 3d at 37. Possession of cocaine with intent to sell was held to involve moral turpitude largely because of the element of personal gain which motivated the illegal conduct. In *Searcy v. State Bar of Texas, supra,* an attorney was convicted of knowingly making a false statement in an application for a bank loan. The court determined that the gravamen of the crime, knowingly lying to obtain a loan for personal benefit, rendered the crime one of moral turpitude.

### III

We turn now to a determination whether the accused in this case committed a misdemeanor involving moral turpitude. The accused was convicted of a misdemeanor for an attempted violation of ORS 475.992(4)(b), which provides:

"(4) It is unlawful for any person knowingly or intentionally to possess a controlled substance unless the substance

---

[8] Many of these federal cases are compiled at 23 ALR Fed 480 (1975). The federal cases do not consider whether drug offenses involve moral turpitude because violations of drug laws are independent grounds for deportation. 8 USC § 1251(a)(11).

was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of his professional practice, or except as otherwise authorized by ORS 475.005 to 475.285 and 475.991 to 475.995. Any person who violates this subsection with respect to:

"* * * * *

"(b)   A controlled substance in Schedule II, is guilty of a Class C felony."

■   There is no distinction with respect to moral turpitude between the commission of a substantive crime and an attempt to commit it. See sources cited in 3 Am Jur 2d 939, *Aliens and Citizens* § 80. If the completed crime was a felony, a lawyer cannot avoid discipline by obtaining a reduction of the charge to a misdemeanor attempt where the completed crime involves the elements of moral turpitude.

■   We conclude, as to the elements of the crime at issue here, the following: this attempted possessory offense requires the element of intent or knowledge; however, it does not contain the element of fraud, deceit or dishonesty and does not involve harm to a specific victim. Neither is this case one involving illegal activity undertaken for personal gain. It does not contain any of the elements, in addition to intent, that we have interpreted moral turpitude to require.

There is a distinction between the crimes of possession of a controlled substance and trafficking or sale. In the era of alcohol prohibition, courts held that trafficking and sale of alcohol were acts of moral turpitude while possession for personal use was not. *See Coykendall v. Skrmetta,* 22 F2d 120 (5th Cir 1927) (making and possessing wine for personal use did not involve moral turpitude); *Baugh v. State,* 215 Ala 619, 112 So 157 (1927) (distilling liquor did not inolve moral turpitude); *Bartos v. United States District Court,* 19 F2d 722 (8th Cir 1927) (brewing and possessing beer for personal use, if not for sale, was not a moral turpitude offense).

This distinction continues under our current prohibitory laws. *State v. Harvey,* 275 SC 225, 227, 268 SE2d 587 (1980), held that simple possession of marijuana was not a crime involving moral turpitude. The court indicated that after "exhaustive research" it could find no case declaring possession of marijuana to involve moral turpitude. In *State v. Lilly,* 278 SC 499, 299 SE2d 329 (1983), the court distinguished

between possession of marijuana, a crime not involving moral turpitude and possession with intent to distribute, a crime involving moral turpitude. *Pearl v. Fla Bd of Real Estate,* 394 So2d 189 (Fla App 1981), reviewed drug offense cases and observed that none of these held moral turpitude to be involved in the possession of controlled substances. The court held that "mere possession of a controlled substance is not a crime * * * involving moral turpitude." 394 So2d at 192. Similarly, in *In re Higbie,* 6 Cal 3d 562, 572, 99 Cal Rptr 865, 493 P2d 97 (1972), the California Supreme Court, in considering whether conviction for failure to pay a marijuana transfer tax involved moral turpitude, noted that, although possession or use of marijuana was unlawful, such conduct was not an act of "baseness, vileness or depravity" as moral turpitude is defined. The court held that the conviction did not involve moral turpitude, but the accused's act of counseling others in a marijuana smuggling scheme did and imposed a sanction.

Our own case of *State v. Edmunson, supra,* discusses possession of intoxicating liquor during prohibition as a "technical offense" not contemplated as punishable under the attorney discipline statute predating that at issue in this case. 103 Or at 249. The sale of intoxicating liquor, however, was held to involve moral turpitude. This case illustrates the application of the elements we have identified: One who trafficks in prohibited substances not only violates the law for personal gain but, by the same act, also directly contributes to physical harm to the purchaser. Sale and tráfficking offenses meet the elements of moral turpitude. Possessory offenses do not.

We agree with the dissenters that substance abuse is a serious problem in our society. Doubtless the legislature has perceived it as such. Outright prohibition of such drugs as cocaine and marijuana and pervasive regulation of others, such as alcohol, make this clear. However, neither pervasive regulation nor the fact that possessors of controlled substances may contribute to a wider enterprise of illegal and harmful conduct aids in defining the statutory term. As Chief Justice Peterson acknowledges, many regulatory offenses enacted to address some perceived widespread harm are implicated by the dissenters' proposed analysis. Justice Lent seeks to narrow the sweep of this broad definition by distinguishing among controlled substances. However, whether marijuana is

"truly different" from other controlled substances, as he suggests, is an inquiry upon which this court is not equipped to embark. The legislature has provided that possession of marijuana in certain quantities is punished less severely than other possessory offenses. ORS 475.992(4)(f). It is worth noting, however, that possession of one avoirdupois ounce of marijuana or more, presumably without regard to whether it is purchased or grown by the possessor, is punished more severely than possession of cocaine. Marijuana is a Schedule I controlled substance and cocaine is in Schedule II of the Federal Controlled Substances Act, 21 USC § 821, ORS 475.992(4). The federal schedules were adopted in this state by administrative rule. ORS 475.035, OAR 885-80-02.

We hold that the misdemeanor of which the accused was convicted is not one involving moral turpitude.

Complaint dismissed.

**PETERSON, C. J.,** dissenting.

Although I concur with the majority's holding in Part II that we "consider only the crime itself and not the circumstances of each case," 299 Or at 401, I disagree with Part III and therefore dissent.

Cocaine is a powerful narcotic drug whose euphoric effects are short lived and are followed by depression, which in turn results in greater use of the drug. Apart from its physical effects on the user, cocaine use usually produces delusions, frequently causes paranoia and occassionally, homicidal urges. Bailey and Rothblatt, Handling Narcotic Drug Cases 229, § 281 (1972); Cohen, *Health Hazards of Cocaine,* Drug Enforcement 10 (Fall 1982).

It is presently estimated that between 1980 and 1982 the number of Americans trying cocaine for the first time rose from 10 million to 20 million people and that between four and eight million Americans use cocaine at least monthly. Stone, Fromme and Kagan, Cocaine: Seduction and Solution 3 (1984). By contrast, in 1976 only four million Americans were estimated to have used cocaine. The Drug Abuse Council, The Facts About "Drug Abuse" 182 (1980).

As noted by the authors of Cocaine: Seduction and Solution:

"The fastest-growing group of cocaine users is made up of Americans in their late twenties through early forties, including both men and women. Most people who have tried cocaine are over 26 and include blue-collar through upper-class Americans: average, upwardly mobile, educated people who by all outward appearances are successful. * * *" Stone, Fromme and Kagan, *supra* at 4.

One survey in the New York City area revealed that cocaine-related emergency room episodes increased from 771 in 1979, to 1991 in 1980, an increase of 158 percent. *Id.* Nationally, cocaine related deaths increased nearly 200 percent during the same period. *Id.* Statistics from the National Center for Disease Control showed a quadrupling of cocaine related deaths between 1976 and 1981. Caffey, *Counter-attack on Cocaine: The Strategy of Enforcement,* Drug Enforcement 2 (Fall 1982). Probably due to the high cost of even moderate use of the drug, there has been a concomitant rise in non-violent and white-collar crime associated with the increase in cocaine use by the middle class. Stone, Fromme and Kagan, *supra* at 4. Recent studies have more firmly established the correlation between drug use, including cocaine, and crime in general. *See* National Institute of Justice, Department of Justice, Probing Links Between Drugs and Crime (February 1983).

The accused pled guilty and was convicted of attempted possession of cocaine. Possession of cocaine is a felony. ORS 475.992(4)(b). We know that the accused intentionally engaged in conduct which, if completed, would have supported a felony conviction for possession of cocaine. The majority acknowledges that "[t]here is no distinction with respect to moral turpitude between the commission of a substantive crime and an attempt to commit it." 299 Or at 402.

The majority has confessed an inability to distinguish between a definition of moral turpitude as " 'an act of baseness, vileness or depravity in the private and social duties which a man owes his fellowman or to society in general contrary to the accepted and customary rule of right and duty between man and man,' " 299 Or at 393, quoting *Ex parte Mason,* 29 Or 18, 21, 43 P 651 (1896), and that found in *State v. Edmundson,* 103 Or 243, 246, 204 P 619 (1922), which

defines moral turpitude as "anything done contrary to justice, honesty, principle and good morals."

I believe that the social irresponsibility manifested in the accused's conduct at issue here is "contrary to justice, honesty, principle and good morals." Apart from the fact that members of the bar are expected to comport with a higher standard of conduct than are lay persons, *e.g. In re Johns,* 212 Or 587, 321 P2d 181 (1958), persons like the accused who possess and use controlled substances contrary to the law are not helpless victims. Each one has responsibilities to self, family, friends, and to the community. In an era when drug use is on the rise and cocaine use in particular is increasing at an astonishing rate, the moral implications of being part of the problem should be clear to persons in positions of responsibility and trust.

This possessory offense does not contain elements of fraud, deceit or dishonesty and does not involve harm to a specific victim; neither is this case one involving illegal activity undertaken for personal gain. However, it does require that possession occur with intent or knowledge. Intentional or knowing illegal conduct alone is insufficient to constitute moral turpitude. However, certain conduct, even though not falling within the categories identified above, may involve moral turpitude because it contributes to some widespread public harm. Presumably the legislature regards any crime, by definition, as involving social or public harm of some kind. Regulatory offenses involving business practices, election campaign violations, tax offenses and environmental and wildlife protection are examples. However, possession of controlled substances is of a different character and cannot be viewed in isolation.

Although trafficking in and selling controlled substances involve greater degrees of culpability than does mere possession, the presence of persons willing to unlawfully possess and use controlled substances is as essential to the continuing substance abuse problem as are the traffickers. Without persons willing to possess and use their wares the traffickers and sellers would be without customers. Both those who possess and use controlled substances and those who traffic in those substances are responsible for the individual

and societal ills associated with the unlawful use of such drugs as cocaine.

Not to be overlooked is the fact that the legislature (which to a real degree determines the collective watermark of moral conduct) has denominated possession of cocaine a felony. I would hold that the misdemeanor of which the accused was convicted, attempted possession of a controlled substance, is one involving moral turpitude.

I disagree with the holding that no possessory crime contains elements of moral turpitude. While trafficking and sales offenses may be associated with a greater degree of moral turpitude than mere possessory offenses, possession of cocaine alone is attended by a sufficient degree of moral turpitude to meet the threshold requirement for attorney discipline under ORS 9.257(2).[1]

Lawyers should realize that they may still be subject to discipline for conduct such as is involved in this case. See footnote 4 of the majority opinion.

I join in the dissent of Lent, J.

**LENT, J.,** dissenting.

The majority concludes that an attempt to possess cocaine is not a misdemeanor involving moral turpitude. I cannot agree.

ORS 475.992(4)(b) provides:

"It is *unlawful* for any person *knowingly or intentionally* to possess a controlled substance * * *. Any person who violates this subsection with respect to:

"* * * * *

"(b)   A controlled substance in Schedule II [I assume cocaine falls here], is guilty of a Class C felony." (Emphasis added.)

After the accused had pleaded guilty to the misdemeanor of an attempt to commit this Class C felony, ORS

---

[1]Some courts have held lawyers to a stricter standard than laymen because of the position of public trust which lawyers enjoy. In this case we need not decide whether there is a sliding scale of moral turpitude, depending on one's occupation. I am satisfied that this is a crime involving moral turpitude.

161.405(1)(d),[1] these proceedings were commenced, charging that the "conviction constitutes a conviction of a misdemeanor involving moral turpitude."

The Oregon State Bar and the accused have stipulated:

"On June 28, 1982, while waiting outside of Judge Bonebrake's office to see the judge, the accused, Gerald M. Chase, got up from his seat and was seen to drop a matchbox and cigarette rolling papers. Judge Bonebrake's secretary, Harlene Crossen, and three other witnesses, Carole Robertson, Frank Rozales, and Bruce Johnson, all observed said items fall from the accused's pocket. The matchbox was later discovered to contain .27 grams of cocaine. A special prosecutor was called in to handle the case. Mr. Chase was charged with and pled guilty to Attempted Possession of a Controlled Substance (cocaine); a Class A Misdemeanor."

The majority accurately quotes the Trial Board's findings of fact:

"Mr. Chase testified that he was given the cocaine in a matchbox by an in-law in Seattle, had left it in his automobile, and did not know the cocaine was in his possession when it fell from his clothing. He testified that he had put a matchbox in his pocket thinking it contained matches."

Apparently, the majority adopts this same "finding."

The finding is absolutely accurate and is absolutely beside the point. The accused did so testify. Whether that testimony is true is an entirely different matter.

The parties stipulated that if a detective named Sheland were called he would testify to the accuracy of his report, which was received in evidence before the Trial Board. That report, which describes Sheland's interview with the accused at the accused's apartment some nine days after the incident in Judge Bonebrake's anteroom, discloses that the accused first denied any memory of the matchbox falling from his clothing. After the detective reminded the accused that both a package of "zig-zags"[2] and the matchbox were seen

---

[1] ORS 161.405(1)(d) provides that an attempt to commit a Class C felony is a Class A misdemeanor.

[2] Although it is not entirely clear, I gather from other testimony that zig-zags are papers for rolling cigarettes.

falling from his clothing, the accused (according to the exhibit)

> "then said that the match box had been given to him earlier in the day. I followed up on that by asking who gave it to him and he then advised he picked it up off a · coffee table. He remembered it was an older small match box and that now he remembered it was earlier on that day he had been at Paddy's Restaurant, about 1st & Yamhill by his office in Portland and just found the box sitting on the table. He picked it up because he needed matches. He never did open the box and had no idea it held cocaine. [There follows the accused's version of why he patted his pockets when he arose in Judge Bonebrake's anteroom and how he noticed later in the day that he had seen his doctor and had noted that the "zig-zags" were missing.]
>
> "I [detective Sheland] then reviewed his story as given and he advised that was what happened.
>
> "I again asked if he was aware of the contents of the match box and he advised he was unaware. He also advised that at no time had he opened the box or touched any of the contents."

In his testimony the accused "explained" what he felt to be discrepancies in the detective's report. He testified that he told the detective that his visit to the doctor was earlier than the incident in the judge's anteroom, but he did concede that he had told the detective that he had taken the matchbox from a table at Paddy's. He testified:

> "It says, 'I followed up on that day by asking who gave it to him and he then advised, he picked it up off a coffee table.' Again, that is not a totally accurate reflection of our conversation. I told him that I had gone to Paddy's for coffee and that upon leaving, and I can't recall, I have so many of them and I can't recall if I grabbed it from the bar. But what I evidently told him during the conversation was that I picked it up off the table. On each one of the individual tables, they usually have an ashtray and this is early in the morning. So, everything is clean and set for the day's business. There is usually an ashtray with a box of matches inside the ashtray.
>
> "And what I told him was that I had gone there for coffee and then when I left I picked it up off the table, out of the ashtray and table.
>
> "In the context, like I described to you before, there is some language about, 'It was an older, small matchbox.' You've got to understand that when he came to my door and brought this to my attention, I was scared. I was frightened.

And I was grasping for straws and certain things were going through my head. And that's the part about the older matchbox. But, the thing that I want to point out in addition to that it says, 'And now that he remembered it was early on that day, he had been at Paddy's Restaurant,' and I guess the only thing that I take objection to in regard to this report is that I was very specific with him about, you know, time and place and how this had occurred and that's it's written in terms of early or later. And then we get to the discrepancies like in regard to the visit to the doctor's office and how these things just come out of order."[3]

In fairness to the accused, I must note that he explained that his story to the detective was to protect his source in Seattle.

Apparently the majority believes the version that although he had obtained a matchbox in Seattle containing cocaine, he just didn't know that box was in his clothing but thought it was in his automobile. I don't know what version to believe. I do know that he testified that he advised his attorney that "I did in fact, have knowledge of the cocaine in the matchbox, but that I didn't have any idea that I had that on my possession at the time."

Apparently as a result of plea bargaining the accused decided to plead guilty to the "attempt" charge.

Under the version given before the Trial Board, the accused knew that he had some cocaine in a matchbox and knew the matchbox was in his automobile. In other words, he "knowingly" possessed cocaine. Under the version given by the accused to detective Sheland, he didn't know he had cocaine at all, and one must wonder why he would plead guilty to an attempt "knowingly or intentionally" to possess cocaine. If the "Seattle" story is true, we know that he "knowingly" had possession of cocaine a very short time before the incident in Judge Bonebrake's anteroom. For the purposes of this opinion, I shall assume, *arguendo,* that under the charge in this proceeding we are not permitted to go behind the conviction of an "attempt" and reach the question of whether he had

---

[3]No elaboration is required to point out that this garbled version of what occurred at Paddy's Restaurant is diametrically opposed to the testimony of the accused concerning his obtaining possession of the cocaine in Seattle.

possession of cocaine, a Class C felony.[4] *See* ORS 9.527(2), providing that the record of the conviction shall be conclusive.

The majority has produced a truly brilliant review of both the weaknesses and strengths of the case law concerning when a crime involves moral turpitude. The majority's reasoning from that review is seductive. Were we dealing here with legislatively proscribed conduct that, in itself, was not considered by the legislature to be socially less offensive than that to which the name "felony" should be applied, I might succumb. In the kind of misdemeanor here involved I cannot.

This conduct is only a misdemeanor because in the apparent reach of symmetry with respect to inchoate crimes the legislature decided to treat an attempt to commit a Class C felony as only a misdemeanor. The legislature has prescribed a general scheme that reduces attempts to commit specified classes of crimes from the classification of the crime itself to the next lower classification in the hierarchy of crimes. Although the crime attempted may be such as to warrant classification as a crime calling for heavy penalty, the attempt steps down the classification and, therefore, the penalty. ORS 161.405. That does not change the nature of the crime attempted.

Where we must decide whether an attempt to commit a felony is a crime involving moral turpitude, I believe that we must look to whether the felony itself would be a crime involving moral turpitude. The majority concludes that the crime of possession of cocaine is not a crime involving moral turpitude. I disagree, both in the abstract and in application to this particular case.

The majority relies on cases that concerned violation of the laws concerning "alcohol prohibition." Each of those cases involved possession or manufacturing for personal use of alcohol. As the majority recognizes, those cases did not involve "trafficking" or sale of alcohol.

The majority relies on cases continuing the distinction "in our present era of [drug] prohibition." The first case,

---

[4]In *In re Higbie,* 6 Cal 3d 562, 493 P2d 97, 99 Cal Rptr 865 (1972), a case cited by the majority and discussed *infra,* the California court went behind the federal court conviction of failure to pay a tax and considered the actual facts that the lawyer had engaged in a conspiracy to smuggle marijuana.

*State v. Harvey,* 275 SC 225, 268 SE 2d 587 (1980), concerned whether the trial court erred in allowing the prosecutor to ask a defense alibi witness about the witness' prior guilty plea to a charge of possession of marijuana. The rule of law was that a witness could not be impeached by specific acts of misconduct except for crimes involving moral turpitude. As the majority here states, the South Carolina court stated that "exhaustive research" had produced no decision that simple possession of marijuana was a crime involving moral turpitude. The court then held that simple possession was not a crime of moral turpitude. I suggest that the South Carolina court embarked on the wrong "exhaustive research." That the court found no case holding that it was a crime involving moral turpitude is meaningless. It should have been looking for a case that held that simple possession of marijuana *did not* involve moral turpitude. True, *State v. Harvey, supra,* can now be accurately cited for the rule that simple possession of marijuana does not involve moral turpitude, but the basis of the decision is suspect.

The majority next relies on *State v. Lilly,* 278 SC 499, 299 SE 2d 329 (1983), for holding that simple possession is not a crime involving moral turpitude. That is what the court, in a per curiam opinion, said, not what it held. It held that possession with intent to distribute did involve moral turpitude. What it said was based on its own case of *State v. Harvey, supra.*

The next case is a decision by an intermediate court of appeals, *Pearl v. Fla. Bd. of Real Estate,* 394 So 2d 189 (Fla App 1981), a two-to-one decision involving revocation of a real estate salesman's license. The majority states that the opinion "reviewed drug offense cases and observed that none of these held moral turpitude to be involved in the possession of controlled substances." 299 Or at 403. My reading of the opinion tells me that the court first reviewed a group of Florida cases that had nothing to do with drug offenses. A second category of cases reviewed from other jurisdictions likewise were not drug offense cases. The third category reviewed by the Florida intermediate court of appeals found that certain crimes in certain states *did involve* moral turpitude:

Missouri: sale of opium.

California: physician's failure to keep a record of narcotics dispensed to a known addict.

Texas: sale of morphine.

Arizona: sale of drugs for non-medical use.

The majority states that the Florida court could find no case in which possession constituted moral turpitude. The Florida court said no such thing.

The Florida court said:

> "None of these authorities [above described] involves mere possession of drugs. The cited authorities persuade us that mere possession of a controlled substance is not a crime [involving moral turpitude]."

394 So 2d at 192. I nominate this for one of the outstanding non sequiturs of our time. Not one of those cases was concerned with the mere possession of a controlled substance. The true quest would be to find a case holding that mere possession did not involve moral turpitude. The Florida court majority went on to take into account the "totality of circumstances" and the finding (below) of treatment and rehabilitation. (The majority in the case at bar recognizes that such subsequent conduct has no bearing on the central question.) The court concluded that the purpose of the real estate licensing statutes was

> "to insure the protection of the public from unscrupulous and dishonest real estate brokers. Its purpose is to guard against fraudulent real estate practices."

394 So 2d at 192.

Although one purpose of Oregon law may be to protect the public from dishonest and unscrupulous attorneys, I sincerely hope the majority, by citing the Florida case, is not holding that that is the only purpose of our statutes and the Code of Professional Responsibility. It is true that the object of sanctions in attorney disciplinary cases is the protection of the public rather than punishment of the attorney, but the statutes and the Code of Professional Responsibility, in identifying conduct for which sanctions may be imposed, reaches further. In fact, the majority of the canons, which are part of the Code, as well as the Disciplinary Rules, are not directly concerned with dishonesty or unscrupulousness.

I am astonished by the majority's reliance on the fourth case cited in the opinion, namely, *In re Higbie,* 6 Cal 3d 562, 493 P2d 97, 99 Cal Rptr 865 (1972). There the disciplinary proceeding arose out of the lawyer's conviction on a guilty plea of failure to pay the federal transfer tax on transfer of marihuana (as it is known to the Feds). The lawyer was engaged in a scheme to smuggle marijuana from Mexico to California to help out a bunch of his Yuppie friends, who wanted to indulge their habit. He was actually involved in a smuggling operation but copped out to the tax offense.

> "The United States Attorney's motivation to reduce the charge apparently derived from the difficulty in proving respondent's fraudulent intent and from the possible success of respondent's establishing a defense of entrapment."

493 P2d at 100. The court noted that the statute

> "contains no requirement of wrongful intent or intent to defraud the government [and that] an individual may be convicted [of the federal crime of failure to pay the tax] by virtue of his possession of marijuana and his failure, however inadvertent, to pay the tax."

493 P2d at 102. The court then *held* that because the statute did not require a showing of an intent to defraud, the failure to pay the tax (to which the lawyer had pleaded guilty) did not involve moral turpitude.

In its brief the California State Bar actually urged that, given the widespread use of marijuana today, only the use of marijuana for "illicit traffic" could be found to be conduct involving "moral turpitude as a matter of law." 493 P2d at 103. The court agreed, stating that possession alone

> "does not constitute 'an act of baseness, vileness, or depravity . . . contrary to the accepted and customary rule of right and duty between man and man.' (In re Craig, *supra,* 12 Cal.2d at p. 97, 82 P.2d at p. 444), or indicate that an attorney is unable to meet the professional and fiduciary duties of his practice."

493 P2d at 103. This is pure dictum; this was not a possession case. The court concluded that the attorney, although not motivated to defraud the government in the smuggling scheme, had engaged in an unlawful conspiracy that included conduct that did involve moral turpitude. The court suspended the lawyer from practice.

The majority, on the basis of these authorities, concludes that mere possession of "prohibited substances" does not involve moral turpitude but that trafficking in those substances would involve moral turpitude. This lumping together of all controlled substances conceals the fact that marijuana is truly different from such manufactured substances as heroin, cocaine, LSD, angel dust, methamphetamines, etc.

A person could easily grow a small quantity of marijuana exclusively for his own use. His possession of that marijuana (as distinguished from the growing stage) and consumption of it would not be a part of the trafficking which often takes place in marijuana. The same is not true with respect to the other controlled substances above named.

One who does not manufacture or produce heroin or cocaine but comes into possession of heroin or cocaine has necessarily obtained it as the final result of trafficking in drugs. Someone has produced the finished product. It has been distributed and sold. The ultimate purchaser is a part of that trafficking. Indeed, were it not for the ultimate purchaser, the whole, worldwide illicit traffic in substances such as cocaine would collapse. The purchaser at the very least must be regarded as fostering the illicit trafficking, which now consumes so much of society's resources in attempting to eradicate the trafficking.

The three cases (two jurisdictions) decided by senior appellate courts on which the majority relies all involved marijuana. (We don't know what substance was involved in the Florida case.) The case before us does not involve attempted possession of marijuana. It involves attempted possession of cocaine. I would hold that the knowing or intentional unlawful possession of cocaine involves moral turpitude and that the attempt to commit that felony is a crime involving moral turpitude.

I understand the majority to say by footnote 4 of its opinion that it does not today decide whether an attorney at law could be sanctioned for possession of any controlled substance in circumstances that would support a felony conviction, regardless of whether the attorney is prosecuted and convicted. I caution the members of the Oregon State Bar that

"mere" possession, in a case properly charged in disciplinary proceedings, may result in sanctions.

I do not reach what would be the appropriate sanction in this case, but if the court could be persuaded to my point of view, the court would have to consider which of the accused's versions of his acquisition of this cocaine is true, if any is true.

Peterson, C. J., joins in this dissenting opinion.