Irwin BROWNSTEIN

v.

**ARCO PETROLEUM PRODUCTS COMPANY.**

Civ. A. No. 84–4282.

United States District Court,
E.D. Pennsylvania.

Jan. 3, 1985.

Gary A. DeVito, Norman P. Zarwin, Zarwin, Baum, Resnick & Cohen, Philadelphia, Pa., for plaintiff.

Richard Gaines, Sara A. Augenbraun, Legal Dept., Atlantic Richfield Company, Philadelphia, Pa., for defendant.

## MEMORANDUM

DITTER, District Judge.

On October 18, 1984, I granted plaintiff Irwin Brownstein's motion for a preliminary injunction pursuant to section 105 of the Petroleum Marketing Practices Act, 15 U.S.C. § 2805 (1982), against defendant Arco Petroleum Products Co. (Arco). I now supplement the findings and conclusions I then made as the bases for that relief.

The operative facts are mostly undisputed. On September 23, 1981, the parties entered into a franchise arrangement consisting of a lease and an allied products-marketing contract covering a service station at Roosevelt Boulevard and Rhawn Street, Philadelphia. Under the terms of these agreements, the franchise relationship was to run until November 1, 1984.

By letter dated March 29, 1984, Arco advised Brownstein that it had determined to sell the premises and that the lease and allied marketing agreement would not be renewed. Thereafter, on June 4, 1984, Arco offered to sell the premises to plaintiff for $290,000. Upon receipt of Arco's offer, Brownstein contacted Louis Iatarola, a designated, independent MAI real estate appraiser, and asked him to appraise the premises.

Iatarola used two methods of appraisal: the market approach and the cost approach. Under the former, he compared the premises to eight service stations in Northeast Philadelphia that had been sold in the preceding 19 months. Using the sales prices of these comparable properties as a benchmark, Iatarola made adjustments to reflect dissimilarities among the comparable properties and the subject property. In this way, he estimated the fair market value of the property to be $190,000.

Under the cost approach, Iatarola first estimated the value of the land by comparing it to five unimproved parcels that had been sold in the preceding 19 months. He determined the land to have a fair market value of $140,000. To this figure, Iatarola added the depreciated reproduction costs of the building, equipment, and site improvements, concluding the total fair market value of the property to be $192,000.

Based on Iatarola's appraisal, Brownstein's attorney wrote to Arco and rejected the $290,000 offer, urging that it was too far in excess of fair market value.

In arriving at its offering price of $290,000, Arco had engaged the services of Felice A. Rocca, Jr., a designated, independent MAI real estate appraiser. Using only the market approach, Rocca compared the subject property to five comparable properties that had been sold in the recent past, and set the value of the property at $250,000.

Arco's Philadelphia area commercial properties representative, Kinsley E. Shannon, prepared an internal sales proposal, noting the $250,000 appraisal and requesting his superiors to approve a $290,000 offering price. In a portion of the proposal labeled, "Negotiating history and recommendations," Shannon indicated that because Brownstein was being divorced, a sale would probably not be consummated through negotiation. Shannon further stated that although the location is a good one, the volume of business transacted there was low and would probably not substantiate the market value.

An Arco internal worksheet, dated May 3, 1984, noted the property is highly visible and worth the $290,000 price.[1] However, ironically, the worksheet recognizes that the asking price is well over fair market value.

On May 3, 1984, Richard E. Erdlitz, Arco's commercial properties manager for the eastern area, sent Shannon an authorization for commitment to sell the property to Brownstein for $290,000. This document also noted that although the location of the property is good, the asking price is well over market value.

On July 1, 1984, in response to the letter of Brownstein's attorney rejecting the $290,000 offer, Erdlitz sent Shannon an internal memorandum which stated that the premises is "good property;" if exposed to the outside market would generate substantial interest; there was nothing in Arco's policy that would require it to offer the property at fair market value;

---

1. This conclusion is questionable in light of Mr. Shannon's observation that the volume of business transacted at the station was low and the finding of both Mr. Iatarola and Mr. Rocca that

the highest and best use of the property was as a service station. See Affidavit of Felice A. Rocca, Jr., Exhibit 3, at 2; Appraisal Report of Louis A. Iatarola at 7.

and the Petroleum Marketing Practices Act does not require the price to be a specific amount. On cross examination, Erdlitz stressed that Arco believes it is in no way bound to sell property subject to the strictures of the Act at fair market value.[2]

The Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801 *et seq.* (1982), was enacted to combat the severe imbalance in bargaining power that existed between petroleum franchisors and franchisees. *See* S.Rep. No. 95–731, 95th Cong., 2d Sess. 17–18, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873, 875–76. Prior to passage of the PMPA, a leading franchise commentator observed:

> In the Nation's second largest industry, the major oil firms have the gasoline dealers in virtual bondage, hinged on the constant threat that their short-term contracts will not be renewed unless they submit to burdensome franchisor-imposed practices.

Brown, *Franchising—A Fiduciary Relationship,* 49 Tex.L.Rev. 650, 655–57 (1971). *See also* Comment, *Retail Gasoline Franchise Terminations and Nonrenewals under Title I of the Petroleum Marketing Practices Act,* 1980 Duke L.J. 522, 524–25.

The PMPA attempts to alter this imbalance by regulating the grounds and conditions for which a franchisor may terminate or not renew a franchise. 15 U.S.C. § 2802 (1982); *Roberts v. Amoco Oil Co.,* 740 F.2d 602 (8th Cir.1984). The Act gives the franchisee a cause of action against the franchisor for violations of the Act's provisions, including the right to seek a preliminary injunction prior to the expiration of the franchise. 15 U.S.C. § 2805 (1982).

One of the permissible grounds for a franchisor's decision not to renew the franchise is that it, in good faith and in the ordinary course of business, has decided to sell the leased premises. *Id.* § 2802(b)(3)(D). To avail itself of that ground for nonrenewal, however, the franchisor must also, within 90 days of sending notice of nonrenewal, tender to the franchisee a bona fide offer to sell the leased premises. *Id.* § 2802(b)(3)(D)(iii).

The PMPA's enforcement provisions are set forth at 15 U.S.C. § 2805 (1982). The standard for granting a preliminary injunction is not the usual, two-part requirement of probability of success on the merits and irreparable harm. Rather the PMPA sets forth a preliminary injunction standard that is significantly more lenient than the general equity standards. *See Gilderhus v. Amoco Oil Co.,* 470 F.Supp. 1302, 1303 (D.Minn.1979). A court need merely find that plaintiffs' allegations raise "serious questions going to the merits which provide a fair ground for litigation," and that "on balance, the hardships imposed upon the franchisor by the issuance of [the] preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted." 15 U.S.C. § 2805(b)(2) (1982).

■ Legislative history to the PMPA makes clear the proper assignment of the parties' burdens under section 2805. The franchisee has the burden of demonstrating: (1) the existence of a franchise relationship; (2) his status as a franchisee; and (3) the nonrenewal of the franchise relationship by the franchisor. *See* H.R.Rep. No. 95–297, *supra,* at 41, 1978 U.S.Code Cong. & Ad.News at 899. Thereafter, the burden shifts to the franchisor to show that there was a permissible ground for nonrenewal pursuant to section 2802(b). *See id.*

In this case, Arco has conceded that, on balance, the hardships it would suffer if the preliminary injunction were issued are clearly outweighed by the hardships that Brownstein would suffer if the preliminary injunction were denied. Furthermore, plaintiff has established, and defendant does not controvert, that there existed a franchise relationship between the parties, plaintiff was the franchisee, and the fran-

---

**2.** Mr. Erdlitz further testified that "fair market value," as he used the term, referred to that value placed on the property by Arco's outside appraiser.

chise relationship was not renewed by the defendant.

The remaining question is whether defendant has demonstrated a permissible ground for nonrenewal under section 2802(b). In order to prevail, Arco must have established that there are no "serious questions going to the merits" on two issues: (1) whether Arco made a good faith determination in the ordinary course of business to sell the subject property; and (2) whether Arco made a bona fide offer to sell the subject property to Brownstein.

Plaintiff has not contested Arco's assertion that it made a good faith determination in the ordinary course of business to sell the subject premises. Rather, plaintiff attacks the *bona fides* of Arco's $290,000 offer.

The term "bona fide offer" is neither defined in the PMPA nor discussed in the Act's legislative history. It has been generally defined to mean "In or with good faith; honestly, openly, and sincerely; without deceit or fraud.... *Real, actual, genuine, and not feigned." Black's Law Dictionary* 160 (5th ed. 1979) (emphasis added).

Defendant has taken the position that it may offer a parcel of property subject to the Act to the franchisee at any price so long as that offer is made without malice. It argues that for a court to inquire into the actual market value of the property would be to open a floodgate of litigation in which the federal courts would become the arbiters of disputes between appraisers arguing conflicting market values.

I believe defendant's contention goes too far.

First, I believe that for a court to conclude an offer is bona fide or *actual,* especially when viewed against the PMPA's concern about pretextual nonrenewals, the defendant must demonstrate *at the very least* that the offer was made in conformity with the offeror's *general* practice for selling property. However, Arco has not even satisfied that burden. It has demonstrated the mechanics of how its chain-of-command processes a proposed offer for sale. It has also shown by way of the affidavit of Kinsley Shannon that it rejected the price per square foot set by its appraiser. However, Arco has not demonstrated how or why it adjusted the figures developed by its appraiser, or how such an adjustment was consistent with a general practice of Arco. Without such information I simply cannot conclude that the offer was bona fide and not merely pretextual.

Moreover, even had Arco demonstrated that the procedures by which it arrived at the offering price were consistent with those utilized in non-PMPA-restricted cases, I am not convinced that it would have satisfied the strictures of the Act. In light of the generally slim profit margins available to petroleum franchisees, *see* Brown, *supra,* at 657, and Congress' desire to avoid pretextual terminations or nonrenewals, a proper reading of the Act compels the conclusion that for an offer to be bona fide—that is *actual*—it must meet or very nearly approach what the offeror believes to be the fair market value of the property.[3] Any increase over fair market value could clearly make a difference in the ability of the franchisee to accept the offer. I cannot believe Congress intended that the elaborate mechanism which it set up in the PMPA could be by-passed by a franchisor's

---

**3.** Fair market value generally has been defined to mean:

> The amount at which a property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. By fair market value is meant the price in cash, or its equivalent, that the property would have brought at the time of the taking, considering its highest and most profitable use if then

offered for sale in the open market, in competition with other similar properties at or near the location of the property taken, with a reasonable time allowed to find a purchaser. *Black's Law Dictionary* 537 (5th ed. 1979) (citations omitted). In a case such as this where no price has been agreed upon, a fair market value can be established by reference to an appraised "highest use" value. This was the approach taken by both appraisers.

simply setting a price substantially in excess of what it believes to be the fair market value, whether or not it is beyond the franchisee's ability to pay.

Consequently, I cannot accept Arco's assertion that it has made a "true" offer to sell when it has raised the offering price by $40,000 (16%) over that estimated by its appraiser. Arco argues that Mr. Rocca's estimate did not take into consideration the value of underground tanks and the pumps installed on the premises. I am unconvinced that this accounts for the increase. First, the letter of April 12, 1984, from Shannon to Rocca does not instruct the appraiser to ignore this equipment. Second, Rocca's appraisal report does not specifically exclude the equipment. Third, there has been no evidence of a practice among appraisers to eliminate such equipment from their reports. It may well be that if the property was being appraised for a non-gas station use, tanks and pumps should not be appraised. That, of course, is not the case here. Finally, even if the appraisal did not include the value of the equipment, I cannot say that this omission accounts for the $40,000 discrepancy. Appended to Shannon's affidavit is a worksheet which sets forth the figures Shannon utilized in arriving at an offering price. According to this sheet, Shannon based the $290,000 price on the sum of two figures. The first is a dollar-per-square-foot amount, netting a total of $273,933. To this figure, Shannon added $17,000 for "Equipment." Presumably this $17,000 allocation is for the same equipment which was allegedly omitted from Rocca's estimate. It appears that the very agent of Arco who proposed the $290,000 offer only viewed the equipment to be worth $17,000.

Arco has simply not articulated to my satisfaction why it chose to increase the price from that suggested by its appraiser. There indeed may be instances in which an appraiser has failed to take into account certain considerations that would justify increasing the offering price over fair market value, but Arco has failed to make that showing here. Similarly, there may be instances in which the offeror's appraiser has

set a price in excess of what would be included in a bona fide offer. However, at this point I need not consider this situation.