**Donald C. TOBIAS, Tobias Associates, Inc., Appellants,**

**v.**

**SHELL OIL COMPANY, Appellee.   (Two Cases)**

Nos. 85–1461(L), 85–1676.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 4, 1985.

Decided Feb. 3, 1986.

Peter Stephens (Robert L. Fredericks, Jr., Robert L. Fredericks, Jr., P.C. on brief), for appellants.

Maureen E. Mahoney (E. Preston Rutledge, Latham, Watkins & Hills on brief), for appellee.

Before HALL, MURNAGHAN and WILKINSON, Circuit Judges.

WILKINSON, Circuit Judge:

Donald Tobias, a terminated service station franchisee, appeals from a district court order granting summary judgment to Shell Oil Company, his former franchisor. The single issue is whether Shell's offer to sell the service station to Tobias fulfilled the requirements of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* We hold that the offer was a bona fide one, 15 U.S.C. § 2802(b)(3)(D)(iii), and we affirm the judgment of the district court.

I.

Tobias operated a Shell service station in Annandale, Virginia under a lease and dealer agreement running from July 1, 1981 to June 30, 1984.  On November 8, 1983, Shell notified Tobias that the company had decided, in good faith and in the normal course of business, to sell the station premises.

The parties do not dispute the validity of that decision not to renew the franchise relationship, and they agree also that the Petroleum Marketing Practices Act (PMPA) required Shell to follow the termination with "a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises." 15 U.S.C. § 2802(b)(3)(D)(iii).

To discharge that obligation, Shell asked Tobias in the fall of 1983 whether he would be interested in purchasing the station. Relying on a 1982 appraisal, the Shell real estate representative for the Mid-Atlantic district started discussions at a price of $195,000. This offer included the land, the station building, and other miscellaneous equipment such as the gasoline pumps.

The offer did not, however, include the five underground tanks that were used at the station for the storage of fuel. Three of these unprotected steel tanks had been in place for twenty years by 1983, one had been in place for seventeen years, and the other had been in place for thirteen years. Shell refused to sell the tanks because it believed that facilities of this age and composition presented a risk of leaks into the soil and groundwater—a fear supported by an American Petroleum Institute conclusion that 85% of all fuel leaks with a potential for serious environmental damage occur in steel tanks that are over ten years old. At service stations similar to that operated by Tobias, Shell had adopted a policy of replacing unprotected steel tanks with non-corrodible fiberglass equipment.

In the preliminary negotiations, Tobias did not object to the exclusion of the steel tanks from Shell's offer. He did object to the bargaining price of $195,000, and Shell in response obtained an updated appraisal that showed the fair market value of the land and property—again not including the tanks—to be $201,620. Although the real estate section of Shell initially urged a sale only for that price, the company decided that an immediate sale would be preferable and offered the premises to Tobias for $183,300. During the discussion of this proposal, Tobias asked Shell to leave in place the underground steel storage tanks. Shell refused, and later offered to install new fiberglass tanks at Shell's equipment cost of $50,000. The company suggested that Tobias could finance this expense through a contract for Shell gasoline.

Tobias declined to purchase the Shell gasoline or the Shell fiberglass tanks, preferring the fuel and the equipment of an alternate supplier. He did buy the station for $183,300 in a contract of June 26, 1984 that closed on October 16, 1984. In the meantime, the station itself closed on October 11, 1984 so that Shell's contractors could remove the old tanks and Tobias' contractors could install the new tanks. The station re-opened on November 9, 1984, with the pumps restored to full operation on November 12 and the parking lot available for full use on December 4.

One week later, on December 10, 1984, Tobias filed suit against Shell, claiming that the company's refusal to sell the steel tanks had violated the Petroleum Marketing Practices Act and had caused Tobias significant losses. Tobias argued that Shell's duty under 15 U.S.C. § 2802(b)(3)(D)(iii) to make "a bona fide offer" of the "leased marketing premises" was both strict and comprehensive, including the entire "marketing premises owned, leased, or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel." 15 U.S.C. § 2801(9). Because the lease authorized use of the tanks by Tobias as franchisee, Tobias reasoned that the statute required Shell to include the tanks in its offer. This theory found some support in *Roberts v. Amoco Oil Co.*, 740 F.2d 602 (8th Cir.1984), which held "as a matter of law that a bona fide offer to sell leased marketing premises under the PMPA must include the gasoline pumps, storage tanks, dispensers, and other equipment used in distributing motor fuel" even if the transfer and continued use of such equipment threatened environmental harm. *Id.* at

607; *see also Greco v. Mobil Oil Corporation,* 597 F.Supp. 468 (N.D.Ill.1984).

Tobias' theory found no success, however, before the district court, which granted summary judgment to Shell on finding that the company's offer met the requirements of the PMPA. *Tobias v. Shell Oil,* 606 F.Supp. 458 (E.D.Va.1985). Tobias now appeals.

## II.

■ We agree with the district court that Shell fulfilled its statutory obligations by offering to sell the fiberglass tanks, at Shell's equipment cost, in place of the unprotected steel tanks. The purposes of the Petroleum Marketing Practices Act do not support Tobias' argument that the franchisee's right to the franchisor's interests in the leased marketing premises must include a right to environmentally hazardous storage tanks in use at the time that the franchisor offers to sell the station. Such a requirement would not direct franchisor conduct toward any PMPA goals; it would merely sacrifice regulatory flexibility for a solipsistic literalism. That danger is starkly visible in the course of collision on which Tobias would place the PMPA and legislation protecting the environment by the further regulation of petroleum distribution. For both of these reasons—the absence of a foundation in the PMPA and the inconsistency with related congressional enactments—we cannot accept Tobias' argument that Shell's duty under § 2802(b)(3)(D)(iii) was to make a bona fide offer that included leak-prone steel tanks as part of the leased marketing premises.

■ Congress enacted the PMPA in order to establish "minimum Federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel by the franchisor or supplier of such fuel." S.Rep. No. 95–731, 95th Cong.2d Sess. 15, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873. These standards incorporate both procedural and substantive considerations in defining a "bona fide offer" under § 2802(b)(3)(D)(iii). On a procedural level, the PMPA seeks to protect the individual franchisee from arbitrary or discriminatory treatment by a franchisor. S.Rep. No. 95–731 at 15, 1978 U.S.Code Cong. & Ad.News at 874. To show that a contested offer is bona fide, therefore, the defendant must demonstrate "that the offer was made in conformity with the offeror's general practice for selling property." *Brownstein v. Arco Petroleum Products,* 604 F.Supp. 312, 315 (E.D. Pa.1985). This particular focus of the PMPA is complemented by a more general substantive concern with "remedying the disparity in bargaining power between franchisors and franchisees." S.Rep. No. 95–731 at 18, 1978 U.S.Code Cong. & Ad. News at 877. The rule of conformity with the offeror's general practices is accordingly accompanied by the requirement that a bona fide offer "must meet or very nearly approach" the fair market value of the fully operative leased station. *Brownstein v. Arco,* 604 F.Supp. at 315.

The uncontroverted record before the district court on the cross-motions for summary judgment shows that Shell has satisfied both of these requirements in the present case. In keeping with the procedural obligations, the company formulated its offer through regular corporate channels and extended terms in conformity with corporate policies. Shell's refusal to surrender control of the steel tanks did not isolate Tobias for unfair treatment; the decision was part of Shell's program of replacing all unprotected steel tanks with fiberglass models. In pursuing this policy for the protection of the environment from underground fuel leaks and the protection of the company from potential tort liability, Shell has now placed fiberglass tanks in approximately five-sixths of the stations in Tobias' region. Tobias has pointed to no contrary transactions to refute that tank replacement is a universal feature in the Shell pattern of station sales, and he has produced nothing to suggest that his own correspondence to the company's pattern is coincidental or pretextual.

Nor has Tobias raised a genuine issue of material fact with respect to the more sub-

stantive federal minimum standards of § 2802(b)(3)(D)(iii). Shell offered to sell its entire interest in the station, except the old steel tanks, for $183,300 and offered to install new fiberglass tanks for $50,000. Shell's total asking price for the fully operative station was therefore $233,300. This position met or very nearly approached the fair market value of the leased premises. The undisputed value of the land, building, and equipment—not including the tanks—was $201,620. The value of the installed steel tanks, according to Tobias' affidavit, could be measured by an available replacement price of $27,590 from a supplier other than Shell. These figures together argue for a fair market value of $229,210. Shell's offer of $233,300 thus exceeds Tobias' estimation of fair market value by $4,090 or only 1.8%.

We do not accept the view that Shell was obliged to tender Tobias a fair market offer on the station with its steel tanks. The overwhelming majority of dangerous gasoline leaks occur in such old, unprotected tanks. Leaks can necessitate evacuation of homes and businesses, cause explosions and fires, and contaminate the groundwater supply. *See* Conservation Law Foundation, *Underground Petroleum Storage Tanks: Local Regulation of a Groundwater Hazard* (1984) (hereinafter CLF Study). The expense of clean up efforts and the extent of litigation resulting from such leaks can be substantial. *Id.* at 9.

Shell was thus within its rights to replace such tanks and to offer a total price reflecting its cost of replacement, so long as that price met or very nearly approached the fair market value of the property.

*Brownstein, supra,* 604 F.Supp. at 315. Shell may be in fact the logical party to replace the tanks, since "large corporations have the resources" to initiate leak prevention programs and "the smaller independent distributors and station operators usually do not." CLF Study at 11. The fact that Shell may have acted to minimize its exposure to liability or to protect its reputation—motives Tobias dismisses as "almost entirely self-serving"—is not important. The cultivation of corporate goodwill through environmental protection does not impeach the *bona fides* of the offer under the PMPA. Such prudence is the object of law, not an act in violation of it.[1]

Shell's plan to substitute storage tanks thus followed the procedural and substantive guidelines that the PMPA provides for a franchisor extending a bona fide offer to sell a working station. A further requirement to include the current operating equipment would serve no PMPA purpose.[2] In addition, such a requirement would also conflict with other legislation, the Hazardous and Solid Waste Amendments of 1984, Pub.L. 98–616 § 601, 98 Stat. 3221, 3277 (1984). In that statute, Congress has prohibited any further installation of unprotected steel tanks, even new ones in which leakage would not be likely to occur for some years.

Here two statutes touch on the regulation of storage equipment in service stations; Tobias argues that the first of these statutes, the PMPA, requires Shell to offer the particular tanks in place when it sells its interest in the leased marketing premises. As in other situations, "courts may properly take into account the later Act

---

**1.** We are not persuaded that the purposes of the PMPA would be enhanced by an alternate course of action here. If Shell had replaced the tanks at an earlier stage, that cost would nonetheless be reflected in the ultimate purchase price. Shell asserts its policy is to replace sooner rather than later, though the marginal profitability of the Tobias station caused the company to delay action in this case until it determined the station would not close down altogether. If Shell were to sell Tobias the station with the old steel tanks, the offering price would in all probability reflect the potential for future liability.

**2.** To the extent that a contrary position is adopted in *Roberts v. Amoco Oil Company,* 740 F.2d 602 (8th Cir.1984), we simply register our disagreement. We note, however, that the franchisor in *Roberts v. Amoco Oil* apparently did not offer to supply the franchisee with substitute storage facilities and therefore did not attempt to sell a fully operative service station. Because Shell has properly directed its offer toward that object of the fair market value requirement, the two holdings do not ultimately appear contradictory.

when asked to extend the reach of the earlier Act's vague language to the limits which, read literally, the words might permit." *N.L.R.B. v. Drivers Local Union,* 362 U.S. 274, 291–92, 80 S.Ct. 706, 716, 4 L.Ed.2d 710 (1960). We can only conclude that Congress did not through one law demand the continued use of old, dangerous steel tanks and through another law forbid the installation of newer, less dangerous steel tanks. Another conclusion would violate the axiom that statutes should be harmonized to the fullest possible degree. *Morton v. Mancari,* 417 U.S. 535, 549–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974). Tobias' reasoning therefore falls not only from a lack of support in the PMPA; it falls also from the opposing force of related environmental legislation.

The judgment of the district court is accordingly

AFFIRMED.