**Charles J. PORTALUPPI, Plaintiff,**

v.

**SHELL OIL COMPANY, Defendant.**

**Civ A. 87–1129–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

April 12, 1988.

Warren G. Stambaugh, Arlington, Va., for plaintiff.

Maureen E. Mahoney, Latham & Watkins, Washington, D.C., for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This is an action for wrongful termination of a service station franchise.[1] Defendant terminated plaintiff's franchise on the ground that plaintiff pleaded guilty

---

**1.** Subject matter jurisdiction is properly premised on 28 U.S.C. § 1332 (diversity) and 28 U.S.C. § 1331 (federal question). Plaintiff is a citizen of Virginia and defendant is a Delaware corporation with its principal place of business

to a felony charge of cocaine possession. Cocaine possession, defendant claims, is a valid ground for termination under the lease and the applicable franchise statutes because it is a crime involving "moral turpitude." Plaintiff sharply disagrees, contending that mere possession of cocaine, as distinguished from possession with intent to distribute, is not a crime involving moral turpitude. These conflicting contentions frame the principal issue presented here.

Procedurally, this matter is before the Court on cross-motions for summary judgment. Plaintiff moved for partial summary judgment on Count I of the Complaint and defendant then filed a cross-motion for summary judgment on all counts on the ground that conviction of cocaine possession is a legally adequate basis for termination. The Court's resolution of defendant's motion is essentially dispositive of the case and is therefore the principal focus of this Memorandum Opinion.

## BACKGROUND

The dispositive facts are undisputed. Plaintiff, Charles Portaluppi, operates a gasoline station in Woodbridge, Virginia. The station is leased to plaintiff under various agreements with defendant Shell Oil Company. These agreements constitute a franchise and create a franchise relationship as defined in the PMPA. *See* 15 U.S.C. § 2801. The parties' franchise relationship is governed by: (1) the parties' Motor Fuel Station Lease; (2) the PMPA, which sets forth conditions under which a franchisor may terminate or elect not to renew a franchise agreement; and (3) the Virginia Petroleum Products Franchise Act (VPPFA), Va.Code Ann. §§ 59.1–21.8 to –21.18:1.

The Lease, the PMPA, and the VPPFA all contain essentially the same provisions. They provide that the franchisor may terminate any franchise upon the occurrence of an event which is relevant to the fran-

---

outside Virginia. Further, plaintiff's claim arises under the federal Petroleum Marketing and Practices Act (PMPA), 15 U.S.C. §§ 2801–2806.

chise relationship and as a result of which termination of the franchise or nonrenewal is reasonable.[2] Both the PMPA and the VPPFA include as a reasonable ground for termination a conviction of the franchisee of any felony involving moral turpitude.[3] In addition, the Lease and the VPPFA provide that no transfer or assignment of a franchise by a dealer to a qualified transferee or assignee shall be unreasonably disapproved by the franchisor.[4]

In July 1987, plaintiff pleaded guilty to possession of cocaine, a felony offense under Va.Code Ann. § 18.2–250. Shell terminated plaintiff's franchise effective January 18, 1988, asserting as grounds for the termination plaintiff's felony conviction. Shell asserts that this termination was reasonable because (i) such a felony conviction is a crime involving moral turpitude, and (ii) even if a conviction of possession of cocaine is not a crime involving moral turpitude, it is an event "relevant to the franchise relationship" warranting termination.

Plaintiff brought this action asserting that Shell wrongfully terminated the franchise relationship. In Count I, plaintiff asserts (i) that possession of cocaine is not a crime involving moral turpitude therefore defendant's termination was wrongful, (ii) plaintiff's conviction was not an event "relevant to the franchise relationship," therefore termination was wrongful, and (iii) that defendant used plaintiff's conviction as a pretext to terminate the relationship because defendant wishes to convert plaintiff's station from a full service station to a gas only station. In Count II, plaintiff asserts that defendant "unreasonably dis-

approved" plaintiff's proposed sale of the station to plaintiff's father in violation of Va.Code Ann. §§ 59.1–21.11(5). Finally, in Count III, plaintiff asserts that defendant is in breach of the parties' Motor Fuel Station Lease by virtue of the termination and the unreasonable disapproval of plaintiff's proposed sale of the station to his father.

The issues were briefed and orally argued. The Court concludes first that possession of cocaine is a crime involving moral turpitude. Nor was Shell's reliance on the conviction a pretext for illegitimate reasons. Therefore, Shell's termination of plaintiff's franchise was reasonable. *See* 15 U.S.C. § 2802(b)(2)(C). Alternatively, the Court holds that even if "mere possession" of cocaine is not a crime involving moral turpitude, such a crime is an event relevant to the franchise agreement which warrants termination. *See* 15 U.S.C. § 2802(b)(2)(C).

## ANALYSIS

### 1. *Moral Turpitude*

■ Virginia's leading case on crimes involving moral turpitude is *Parr v. Commonwealth*, 198 Va. 721, 96 S.E.2d 160 (1957). There, the Supreme Court of Virginia stated that such a crime is "an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow man, or to society in general, contrary to the accepted and customary rule of right and duty between man and man."[5] 96 S.E.2d at 163. The Fourth

---

**2.** The PMPA, Title 15 U.S.C. § 2802(b)(2)(C) provides, in pertinent part, that any franchisor may terminate any franchise or may fail to renew any franchise relationship upon "[t]he occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise relationship is reasonable."

The VPPFA, Va.Code Ann. § 59.1–21.14(B) provides that "[a] producer or refiner shall not terminate, cancel, or fail to renew, a petroleum products franchise, except for reasonable cause."

**3.** *See* 15 U.S.C. § 2802(c)(12) ("conviction of the franchise of any felony involving moral turpitude"); Va.Code Ann. § 59.1–21.14(A)(2) ("Crim-

inal conduct or violations of the law by the dealer involving moral turpitude").

**4.** *See* Va.Code Ann. § 59.1–21.11(5).

**5.** In applying this definition, the court in *Parr* held that gambling and operating a numbers game were not crimes involving moral turpitude. 96 S.E.2d at 163. The court concluded that "while the conduct of a 'numbers game' is contrary to the public policy of . . . [Virginia] . . . and our standard of morals, it is not *per se* immoral or inherently evil and does not involve moral turpitude. To adopt the opposite view would lead to the conclusion that other States legalize and permit operations which are *per se*

Circuit's definition is essentially similar. In *Castle v. INS*, 541 F.2d 1064 (4th Cir. 1976), moral turpitude is defined as " 'an act of baseness or depravity contrary to accepted moral standards.' " *Castle*, 541 F.2d at 1066 (quoting *Guerrero de Nodahl v. INS*, 407 F.2d 1405, 1406 (9th Cir.1969)).[6] In *Castle*, the court held that a man's carnal knowledge of a fifteen year old girl, not his wife, "is so basically offensive to American ethics and accepted moral standards as to constitute moral turpitude *per se*." 541 F.2d at 1066. Applying this standard is not an easy task. "The borderline of 'moral turpitude' is not an easy one to locate." *Quilodran–Brau v. Holland*, 232 F.2d 183, 184 (3d Cir.1956); *see Tseung Chu v. Cornell*, 247 F.2d 929, 933 (9th Cir.1957) ("We are not unmindful of the myriad decisions sponsoring various concepts of moral turpitude [but] [t]hey offer no well settled criteria."). This is so because the term refers not to legal standards, but to changing moral standards. This difficulty was best stated by Judge Maris in *United States v. Zimmerman*, 71 F.Supp. 534 (E.D.Pa.1947) (deportation case):

While the term "moral turpitude" has been used in the law for centuries it has never been clearly or certainly defined. This is undoubtedly because it refers, not to legal standards, but rather to those changing moral standards of conduct which society has set up for itself through the centuries.

71 F.Supp. at 537.

American ethics and moral standards have changed over time. About that, there can be no doubt. Examples abound.[7] It

immoral and inherently evil. It is inconceivable that they would do so." 96 S.E.2d at 164.

**6.** Definitions of "moral turpitude" from other jurisdictions are essentially similar. *See, e.g., Rudolph v. United States*, 6 F.2d 487 (D.C. Cir. 1925); *Pino v. Nicolls*, 119 F.Supp. 122 (D. Mass.), *aff'd*, 215 F.2d 237 (1st Cir.1954), *rev'd on other grounds sub nom. Pino v. Landon*, 349 U.S. 901, 75 S.Ct. 576, 99 L.Ed. 1239 (1955); *State v. Edmunson*, 103 Or. 243, 204 P. 619 (1922). Although many jurisdictions adopt the same definition of moral turpitude, they differ on how this definition is to be applied. Some jurisdictions apply a variable standard which considers the circumstances of each case. A crime may or may not be one involving moral turpitude, depending upon the surrounding circumstances. *See, e.g., In re Fahey*, 8 Cal.3d 842, 106 Cal.Rptr. 313, 505 P.2d 1369 (1973); *People v. Gibbons*, 157 Colo. 357, 403 P.2d 434 (1965); *Committee on Legal Ethics v. Sherr*, 149 W.Va. 721, 143 S.E.2d 141 (1965). Other jurisdictions apply a fixed standard, where only the statutory definition of the crime, not the surrounding circumstances, determine whether the crime involves moral turpitude. *See, e.g., Searcy v. State Bar of Texas*, 604 S.W.2d 256 (Tex.Civ.App. 1980); *Fortman v. Aurora Civil Service Comm'n*, 37 Ill.App.3d 548, 346 N.E.2d 20 (1976). Some jurisdictions apply both standards. *Compare In re Mahr*, 276 Or. 939, 556 P.2d 1359 (1976) (applying fixed standard) *with In re Means*, 207 Or. 638, 298 P.2d 983 (1956) (applying "surrounding circumstances" standard). For a discussion of these different standards, see *In re Chase*, 299 Or. 391, 398–400, 702 P.2d 1082, 1086–87 (1985). The Fourth Circuit has not definitely decided this question. The *Castle* court said that it was "unnecessary for judicial or administrative officials to examine the extenuating factors which an offender might raise in his attempt to cleanse himself of the stigma of moral obliquity.... The inherent nature of the offense rather than the circumstances surrounding the transgression is the determinative element." 541 F.2d at 1066 (citations omitted). Significantly, though, the court did not say that in all contexts the narrow focus should be on the crime as defined and not the actual acts and its circumstances. In *Castle*, the court understandably did not want the INS burdened with the often difficult and time consuming task of uncovering all the facts surrounding the act for which a party was convicted. In any event, this Court will here apply the fixed standard approach as Shell, in its termination notice, did not include the surrounding circumstances of the conviction as a ground for the termination. *See infra* note 17.

**7.** Cohabitation without marriage and abortion are prominent examples of conduct once unacceptable and now accepted, commonplace, and, in the case of abortion, raised to a constitutional right. *See Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). *But see* Va. Code Ann. § 18.2–345 ("lewd and lascivious" cohabitation prohibited). Most citizens of a half century or more ago would surely be surprised and appalled by this shift in moral standards.

*See also Twentieth Century Fox Film Corp. v. Lardner*, 216 F.2d 844, 852 (9th Cir.1954) (refusing under all circumstances to tell HUAC whether one is a communist involves moral turpitude); *compare Pollard v. Lyon*, 91 U.S. (1 Otto) 225, 228, 23 L.Ed. 308 (1876) (stating that both adultery and fornication involve moral turpitude "beyond all doubt") *with Ex parte Rocha*, 30 F.2d 823, 824 (S.D.Tex.1929) ("occasional sex-

follows, therefore, that the type of crime that is "offensive to American ethics and accepted moral standards" must necessarily change over time. *See United States ex rel. Berlandi v. Reimer*, 30 F.Supp. 767, 768 (S.D.N.Y.1939) (moral turpitude "is a vague term, its meaning depending to some extent upon the state of public morals"), *aff'd*, 113 F.2d 429 (2d Cir.1940). The question, then, is whether cocaine possession is offensive to contemporary moral and ethical values.

There can be only one answer to this question. Contemporary America is being ravaged by the scourge of drugs, including cocaine.[8] It is sapping the nation's vitality. The national toll in terms of maimed, crippled, or destroyed lives is incalculable.[9] Rarely a day passes without news reports of deaths attributable to cocaine or crack overdoses or dealings.[10] It is doubtful whether our society has any more potent or destructive enemy than cocaine.[11] No wonder that the national effort against drugs is popularly referred to as a war. Indeed, there can be only one answer, namely that a felony cocaine offense is profoundly offensive to contemporary moral and ethical values and this Court so holds.[12]

The Court reaches this conclusion only after confirming that there is no controlling Fourth Circuit authority in point. It is also mindful that decisions on the issue are not uniform. A few courts, distinguishing possession with intent to distribute,[13] conclude that narcotics possession, by itself, is not a crime involving moral turpitude.[14] These decisions are neither controlling nor persuasive. In contrast to these cases is the better-reasoned discussion in *United States v. Cisneros*, 191 F.Supp. 924 (N.D. Cal.1961), where the court stated, in *dicta*, that defendant's prior misdemeanor convictions of unlawful possession of narcotics were crimes involving moral turpitude.

That the offenses in question involved moral turpitude is readily demonstrable. ... The violation of the narcotic drug

---

ual commerce" and adultery are not crimes at common law, but merely a private wrong).

8. In 1976, "only" four million Americans were estimated to have used cocaine. The Drug Abuse Council, The Facts About "Drug Abuse" 182 (1980). Between 1980 and 1982, however, "the number of Americans trying cocaine for the first time rose from 10 million to 20 million people and that between four and eight million Americans use cocaine at least monthly." *Chase*, 702 P.2d at 1090 (Peterson, C.J., dissenting) (citing Stone, Fromme, and Kagan, Cocaine: Seduction and Solution 3 (1984)).

9. "Cocaine is a powerful narcotic drug whose euphoric effects are short lived and are followed by depression, which in turn results in greater use of the drug. Apart from its physical effects on the user, cocaine use usually produces delusions, frequently causes paranoia and occasionally, homicidal urges." *Chase*, 702 P.2d at 1090 (Peterson, C.J., dissenting) (citing Bailey and Rothblatt, Handling Narcotic Drug Cases 229, § 281 (1972); Cohen, *Health Hazards of Cocaine*, Drug Enforcement 10 (Fall 1982)).

10. From 1979 to 1980, cocaine related deaths across the nation increased nearly 200 percent, and statistics from the National Center for Disease Control showed a quadrupling of cocaine related deaths between 1976 and 1981. *Chase*, 702 P.2d at 1091 (Peterson, C.J., dissenting) (citing Caffey, *Counter-attack on Cocaine: The Strategy of Enforcement*, Drug Enforcement 2 (Fall 1982)).

11. *See generally Chase*, 702 P.2d at 1090–92 (Peterson, C.J., dissenting); Drug Abuse Policy Office, *National Strategy for Prevention of Drug Abuse and Drug Trafficking* 90–91 (1984) (recognizing the serious health and safety problems that drug abuse causes in the workplace, and recommending that employers implement policies of "uncompromising discipline" for dealing with drug abuse problems of personnel in positions of public trust).

12. It is important to note the high correlation between cocaine use and crime in general. Recent studies confirm it. *See* National Institute of Justice, Department of Justice, Probing Links Between Drugs and Crime (February 1983); *see also* Nancy Reagan, *Drug Users: Accomplices to Murder*, Richmond News Leader, Mar. 10, 1988, at 14.

13. Virtually all courts agree that narcotics possession *with intent to distribute* is a crime involving moral turpitude. *See, e.g., Atlantic Richfield v. Guerami*, 820 F.2d 280 (9th Cir. 1987) (PMPA case holding that possession with intent is a crime involving moral turpitude, therefore franchise was properly terminated); *United States v. O'Rourke*, 213 F.2d 759, 762 (8th Cir.1954) ("there can be nothing more depraved or morally indefensible than conscious participation in the illicit drug traffic").

14. *See In re Higbie*, 6 Cal.3d 562, 493 P.2d 97 (1972) (drug possession or use not an act of baseness, vileness, or depravity); *In re Chase*, 299 Or. 391, 702 P.2d 1082 (1985).

laws of the United States, and of the several states, is a violation of a rule which is accepted by all decent people involving public policy and morals in the United States. ... The evils which the illicit narcotic traffic brings in its wake are all well known, and they are rightfully the subject of public abhorrence. The traffic in illicit drugs would collapse if suppliers would cease to supply the drugs, or if users would cease to use them. In my opinion, it is clearly demonstrated that either class of offense involves moral turpitude.

It is common knowledge that narcotic addicts must, and will, in order to obtain a supply of the drug to which they are addicted, lie, cheat, or steal. Constant deception and subterfuge are necessary,

if an addict is to remain at liberty and to enjoy the dubious boon of his addiction. *Id.* at 927–28.[15]

2. *Conviction Relevant to Franchise Relationship*

▇▇▇ Assuming that plaintiff's conviction was not a crime involving moral turpitude, the issue then becomes whether plaintiff's conviction was an event "relevant to the franchise relationship" that warranted termination. 15 U.S.C. § 2802(b)(2)(C). It was. No one can seriously dispute that a franchisee's use of cocaine has adverse effects upon the operation of a franchise.[16] It is general knowledge, too often confirmed by experience to be contested, that cocaine and drug use generally is accompanied by irresponsible, aberrant, and often criminal behavior.[17] For this reason, Shell

---

15. *But see In re Chase,* 299 Or. 391, 702 P.2d 1082 (1985). There, a majority of the Supreme Court of Oregon held that attempted possession of cocaine, a misdemeanor, was not a crime involving moral turpitude. The court found that although a possessory offense requires the element of intent or knowledge, "it does not contain the element of fraud, deceit, or dishonesty and does not involve harm to a specific victim." *Chase,* 702 P.2d at 1089. This conclusion flies in the face of reality. Two of the six Justices in *Chase* dissented, stating that the intentional unlawful possession of cocaine involves moral turpitude in that "the social irresponsibility manifested in ...[such] ...conduct ...is contrary to justice, honesty, principle and good morals." *Chase,* 702 P.2d at 1091 (Peterson, C.J., dissenting). Chief Justice Peterson could find no difference between cocaine trafficking and "mere" possessory offenses.

> Although trafficking in and selling controlled substances involve greater degrees of culpability than does mere possession, the presence of persons willing to unlawfully possess and use controlled substances is as essential to the continuing substance abuse problem as are the traffickers. Without persons willing to possess and use their wares the traffickers and sellers would be without customers. Both those who possess and use controlled substances and those who traffic in those substances are responsible for the individual and societal ills associated with the unlawful use of such drugs as cocaine.

*Chase,* 702 P.2d at 1091–92. Judge Lent, also dissenting, agreed with Peterson that there exists no significant distinction between trafficking and possession with respect to the issue of moral turpitude.

> One who does not manufacture or produce heroin or cocaine but comes into possession of heroin or cocaine has necessarily obtained

it as the final result of trafficking in drugs. Someone has produced the finished product. It has been distributed and sold. The ultimate purchaser is a part of that trafficking. Indeed, were it not for the ultimate purchaser, the whole, worldwide illicit traffic in substances such as cocaine would collapse. The purchaser at the very least must be regarded as fostering the illicit trafficking, which now consumes so much of society's resources in attempting to eradicate the trafficking.

*Chase,* 702 P.2d at 1096–97.

16. Such adverse effects include undesirable publicity, which might besmirch the company's public image. Here, a local newspaper reported that cocaine, chemicals, and instruments used in producing "crack" were found in plaintiff's home. The Potomac News, Nov. 10, 1986.

17. Further confirmation of this can be found in the facts surrounding plaintiff's conviction. Shell submitted information that indicates the plaintiff appeared at the service station on several occasions armed with a gun and that he threatened employees. During a search of plaintiff's home, the police seized 16 different guns, including a fully automatic machine gun. Shell also provided the Court with police reports designating plaintiff's Shell station as a "hazard" because the "owner of the station ...is psychologically unstable, a drug user, and is usually armed with a firearm." Indeed, the plaintiff himself wrote to Shell asking that he be allowed to assign his franchise to his father "on the advice of his doctor and lawyer." Yet Shell cannot assert these matters as grounds for termination because Shell failed to give appropriate notice. *See* 15 U.S.C. § 2804(c) (notification must be in writing and state the reasons for termination); *Davy v. Murphy Oil Co.,* 488

has a uniform, nondiscriminatory policy of terminating franchisees convicted of narcotics felonies.[18] *Cf. Tobias v. Shell Oil,* 782 F.2d 1172, 1174 (4th Cir.1986) (upholding challenged business decision in part because Shell acted pursuant to a uniform policy). Plaintiff, however, asserts that Shell's policy is in conflict with the PMPA. According to plaintiff, since the PMPA provides that conviction of a felony involving moral turpitude is a reasonable basis for termination, conviction of any other felony cannot be a ground for termination. Therefore, any policy of terminating franchisees for convictions of crimes *not* involving moral turpitude would contradict the PMPA. Yet accepting plaintiff's analysis would lead to absurd results. For example, the Supreme Court of Oregon, which, as discussed, has held that possession of cocaine is not a crime involving moral turpitude, has also held that the shoplifting of an eight dollar "plug socket" from a Sears store is a crime involving moral turpitude. *See In re Mahr,* 276 Or. 939, 556 P.2d 1359 (1976). Larceny, therefore, is a crime involving moral turpitude. It follows, then, that in Virginia, a franchisee could rightfully be terminated under the PMPA for committing simple larceny, *see* Va. Code Ann. § 18.2–95, or for issuing a bad check. *See* Va. Code Ann. § 18.2–181.1, but not for a felony conviction of drug possession. Clearly, Congress did not intend such a result. While the PMPA sets forth a list of events which provide a reasonable basis for termination or nonrenewal

of a franchise, 15 U.S.C. § 2802(c),[19] this list is merely illustrative, not exhaustive. *See Russo v. Texaco,* 630 F.Supp. 682 (E.D. N.Y.), *aff'd,* 808 F.2d 221 (2d Cir.1986). Certain events, unanticipated by Congress, may also provide a reasonable basis for termination.[20] *Id.* Here, plaintiff's conviction was an event relevant to the franchise relationship for all the same reasons set forth in this Opinion in support of the Court's holding that possession of cocaine is a crime involving moral turpitude.[21]

### 3. *Conviction as Pretext*

■ Plaintiff asserts that Shell's use of plaintiff's cocaine conviction in order to terminate the franchise was a pretext because Shell wanted to convert plaintiff's station from a full service station to a gas only station. Yet this assertion is unsupported. Here, plaintiff has failed to provide any evidence that Shell's decision was not made in good faith. Indeed, there is evidence to the contrary. The franchise agreement is scheduled to expire in October 1988, at which time, pursuant to the agreement, Shell may lawfully condition renewal of the franchise on plaintiff's agreement to the conversion. *See Valentine v. Mobil Oil Co.,* 789 F.2d 1388 (9th Cir.1986) (franchisee's failure to agree to franchise agreement allowing franchisor to convert from a full service to a gas only station constituted good cause for nonrenewal under the PMPA). As plaintiff has failed to establish any "genuine issue of material fact" in dispute with regard to the

F.Supp. 1013 (W.D.Mich.1980) (notice must adequately advise lessee of specific reasons for nonrenewal). Here, Shell notified plaintiff that it was terminating the franchise because of plaintiff's *conviction.* Shell did not include in its notification plaintiff's cocaine-related aberrant behavior as grounds for termination. Accordingly, the issue before the Court is whether a felony conviction for possession of cocaine, standing alone, is an event relevant to the franchise relationship warranting termination.

**18.** It may be argued that possession of cocaine does not impute use. Yet it cannot be disputed that knowing possession must impute either use or intent to distribute, or both.

**19.** Included in this list of events are convictions of any felony involving moral turpitude. 15 U.S.C. § 2802(c)(12).

**20.** Even so, Congress intended the list in § 2802(c) to serve as a standard against which

to assess whether certain unlisted acts could serve as a termination basis. [T]he enumerated list is intended to provide a measure of congressional intent with respect to the meaning of the statutory standard. ...Thus, a judicial determination may be made that an event, other than one enumerated in this list, or an event similar but not identical to one enumerated in the list, constitutes an event which is relevant to the franchise relationship as a result of which termination or nonrenewal is reasonable. However, events which are not enumerated in subsection C must be carefully scrutinized by the courts prior to a determination that the statutory standard set forth in [§ 2802(b)(2)(C) ] has been satisfied. Petroleum Marketing Practices Act, S.Rep. No. 732, 95th Cong., 2d Sess. 37 (1978).

**21.** *See supra* notes 5–15 and accompanying text.

reason for Shell's termination, summary judgment in favor of Shell is appropriate. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (requiring sufficient evidence of factual dispute in order to avoid summary judgment).

### 4. *Denial of Proposed Assignment*

This issue need not be addressed given the Court's holding that plaintiff's franchise was properly terminated by Shell.

An appropriate Order will be entered.