**ATLANTIC AVENUE OIL AND GAS, LTD., Plaintiff,**

v.

**TEXACO REFINING AND MARKETING, INC. and Amoco Oil Company, Defendants.**

No. 88 C 3131.

United States District Court, E.D. New York.

Nov. 7, 1988.

**28**

Maggin & Swan (Hewitt L. Rubel, of counsel), New York City, for plaintiff.

Joseph P. Foley, Sr. Atty., Texaco, Inc. White Plains, N.Y., for defendant Texaco Refining and Marketing, Inc.

Townley & Updike (Richard R. Lutz, of counsel), New York City, for defendant Amoco Oil Co.

Maurice Glover, Atty., Amoco Oil Co., Chicago, Ill., for defendant Amoco Oil Co.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff, a franchisee-operator of a gasoline service station in Richmond Hill, New York, brought this action under the Petroleum Marketing Practices Act (the Act), 15 U.S.C. § 2801 *et seq.* (1982). The complaint alleges that defendant Texaco Refining and Marketing, Inc. (Texaco), is attempting to terminate plaintiff's franchise and sell the service station to defendant Amoco Oil Company (Amoco) without properly notifying plaintiff under 15 U.S.C. § 2804(c) and without offering plaintiff a right of first refusal under 15 U.S.C. § 2802(b)(3)(D)(iii)(II).

Plaintiff moved for a preliminary injunction by order to show cause. At a hearing on plaintiff's request for a temporary restraining order, which was granted, the court and the parties agreed to consolidate the trial on the merits with the hearing on the motion for preliminary injunction. *See* Fed.R.Civ.P. 65(a)(2).

### I.

Plaintiff leases from Texaco a gasoline service station located at 134–30 Atlantic Avenue, Richmond Hill, New York. Texaco supplies the motor fuel. On August 25, 1988, Texaco notified plaintiff in writing that the lease, sales agreement, franchise relationship, and related contracts with plaintiff would terminate as of May 31, 1989 and not be renewed because Texaco in good faith and in the normal course of business had decided to sell the premises. At the same time Texaco gave plaintiff a 45–day right of first refusal of an offer made by Amoco to purchase the service station, without the underground storage tanks and the equipment used for dispensing fuel, for $700,000.

Amoco's offer to purchase provided that, prior to closing, Texaco would remove the storage tanks, allowing Amoco to use Texaco's excavation to install new tanks and lines. Texaco offered to plaintiff terms identical to those offered by Amoco.

Plaintiff then advised Texaco that it was willing to purchase the station "including the gasoline pumps, storage tanks, lines, dispensers, and the like at fair market value," which it judged to be $435,000, the highest figure stated in several appraisals made for Texaco. Texaco rejected this of-

fer, but told plaintiff orally that it would be willing to include the above-ground gasoline-dispensing equipment, such as the pumps, at no charge over the $700,000 asking price, provided the storage tanks were excluded.

At the limited hearing plaintiff expressed a desire to buy the property at whatever price and on whatever terms the court ultimately determined to be permissible under the statute. At that time, it asked the court to toll the 45–day period pending the determination of its motion. The court declined because it had no authority to do so. Plaintiff therefore had to decide by October 9, 1988, the last day of the period, whether to exercise its right of first refusal. Plaintiff elected not to accept the offer within that time.

## II.

Congress intended the Act to protect petroleum "franchisees from arbitrary or discriminatory termination or non-renewal of their franchises." S.Rep. No. 731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S. Code Cong. & Admin.News 873, 874. The Act prohibits termination or non-renewal of a franchise except on certain grounds. *See* 15 U.S.C. § 2802(b)(2), (3). Grounds for non-renewal include:

> (D) ... a determination made by the franchisor in good faith and in the normal course of business, if—
>
> .    .    .    .    .
>
> (i) Such determination is—
> (III) to sell such premises....

15 U.S.C. § 2802(b)(3)(D)(i)(III). The Act also requires the franchisor to notify the franchisee of termination or non-renewal in a specified time and manner. 15 U.S.C. § 2804. If the non-renewal is based on the franchisor's decision to sell the premises, the franchisor must either make the franchisee a "bona fide offer" to sell the premises or give the franchisee a "right of first refusal" of an offer by another to purchase them. 15 U.S.C. § 2802(b)(3)(D)(iii).

### 1. *Notification Under § 2804(c)(3)(A)*

The notification provision of the Act, 15 U.S.C. § 2804, recites in relevant part:

> (c) Notification under this section—
>
> .    .    .    .    .
>
> (3) shall contain—
>
> (A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefore....

█ Plaintiff claims that Texaco's notification was insufficient because it did not indicate why Texaco was selling the franchise. But the Act does not require the franchisor to state why it is making the sale but only to "articulate with sufficient particularity the basis for the decision not to renew so that the franchisee can determine his rights under the Act." *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1226 (7th Cir.1982). Texaco's statement of its intent to sell the premises was sufficient to alert plaintiff to its rights under 15 U.S.C. § 2802. *See Southern Nevada Shell Dealers Assoc. v. Shell Oil Co.*, 634 F.Supp. 65, 68 (D.Nev.1985).

Plaintiff does not suggest that Texaco's decision to sell was made in bad faith or outside the normal course of business. The motivation for Texaco's determination is therefore irrelevant. Texaco's notification was sufficient under § 2804(c)(3)(A).

### 2. *Right of First Refusal Under § 2802(b)(3)(D)(iii)(II)*

Section 2802(b)(3)(D)(iii) requires a franchisor, after proper notice of non-renewal, either:

> (I) [to make] a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or
>
> (II) if applicable, [to offer] the franchisee a right of first refusal of at least 45 days duration of an offer, made by another, to purchase such franchisor's interest in such premises.

In this case, subsection II applies. Amoco has made Texaco an offer to purchase Texaco's interest in the premises, and Texaco has elected to give plaintiff a "right of first refusal" rather than make a "bona fide offer to sell."

Plaintiff contends that Texaco's offer of a right of first refusal is insufficient under the statute because it does not include Texaco's entire interest in the premises, including the under- and above-ground gasoline storage and dispensing equipment. Although plaintiff concedes that Texaco offered, upon plaintiff's request, to sell all of the equipment except the storage tanks, it argues that this offer is insufficient because (a) it does not include the tanks; (b) it was not in writing; and (c) it did not start a new 45-day period.

Plaintiff relies on *Greco v. Mobil Oil Corp.*, 597 F.Supp. 468 (N.D.Ill.1984), holding that a franchisor's offer to its franchisee under 15 U.S.C. § 2802(b)(3)(D)(iii)(II) must include the franchisor's entire interest in the premises, including storage tanks. *Id.* at 473. Plaintiff also finds support in *Roberts v. Amoco Oil Co.*, 740 F.2d 602 (8th Cir.1984), which holds that a "bona fide offer" under 15 U.S.C. § 2802(b)(3)(D)(iii)(I) must include the gasoline storage and dispensing equipment, even if some of the equipment may cause environmental damage or future liability for the franchisor. *Id.* at 607.

Defendants point out the gravity of the environmental concerns in this case. The underground storage tanks here are made of steel encased in concrete. Twelve of the tanks are 20 years old, one is 18 years old, and one is 7 years old. None is cathodically protected against corrosion. According to defendants' affidavits and the credible testimony at hearing, these tanks present a serious danger of leakage into the surrounding soil and water supply. More than 85% of all fuel leaks occur in steel tanks over 10 years of age. American Petroleum Institute Tank and Piping Leak Survey (1981).

Although it will cost Texaco about $75,-000 to remove the tanks, it argues that removal is its only responsible course of action. Its policy is to replace its old steel tanks with new fiberglass ones on a priority basis—an effort that has cost $94.7 million to date—and when it sells service stations to refuse to include the steel tanks in place. Amoco's policy is similar.

Texaco's motivation is not, of course, purely altruistic. It has spent approximately $50 million to clean up contaminated sites and has paid damages of $6,365,636 to third parties as a result of pollution from such sites. Some $7 million in additional claims are currently pending.

Texaco suggests that if the tanks were sold to plaintiff and later sprang a leak—perhaps due to plaintiff's improper maintenance or infrequent testing—Texaco would have no control over the clean-up but could be liable for the damage. Moreover, plaintiff might not have the resources to clean up the site properly, an effort that can cost $200,000 or more. Insurance coverage will not alleviate the problem, since, according to an uncontroverted Texaco affidavit, insurance companies will no longer insure against clean-up costs and third-party damages arising from pollution at service stations.

Petroleum companies may no longer install steel tanks of the kind involved here. Hazardous and Solid Waste Amendments of 1984 (the Amendments), Pub.L. No. 98-616, § 601, 98 Stat. 3277, 3781. Although existing tanks need not be removed under federal law, Texaco witnesses testified that some local governments require their removal.

Texaco argues that the court should reconcile the concern for the environment embodied in the Amendments with the concern for petroleum franchisees expressed in the Act by permitting franchisors to exclude underground steel storage tanks from offers under 15 U.S.C. § 2802(b)(3)(D)(iii)(II), citing *Tobias v. Shell Oil Co.*, 782 F.2d 1172 (4th Cir.1986). That case held that a "bona fide offer" under 15 U.S.C. § 2802(b)(3)(D)(iii)(I) need not include the steel underground storage tanks.

Plaintiff, while not disputing the environmental hazards posed by steel tanks generally, contends that these particular tanks are sound. The station recently passed contamination tests authorized by Texaco and Amoco, and the storage tanks passed tests observed by the New York City Fire Department. The latter tests resulted in renewal of Texaco's permit to operate the

station for the next ten years, unless the Fire Department elects to order earlier retesting.

The credible testimony of Texaco's witnesses at trial indicated, however, that those tests show only that the tanks were sound on the day of the test. They have little predictive value.

The court concludes that it should adopt the reasoning of the *Tobias* case and thereby reconcile the rights of franchisees under the Act with protection of the environment. Although that decision involved a "bona fide offer" under subsection I of §. 2802(b)(3)(D)(iii) and not a "right of first refusal" under subsection II, its rationale is equally compelling here.

With the enactment of the Amendments, six years after the passage of the Act, Congress articulated a policy of preventing environmental contamination of the kind at risk here. "Congress did not through one law demand the continued use of old, dangerous steel tanks and through another law forbid the installation of newer, less dangerous steel tanks." *Tobias, supra,* at 1176.

In view of the policy embodied in the Amendments and the real danger that the steel tanks pose to the surrounding community, the court holds that the franchisor need not offer the franchisee those items of property on the premises that pose a threat of future pollution and liability.

### 3. *The Above–Ground Equipment*

Plaintiff contends that the right of first refusal to which it is entitled under the Act, even if it need not include the underground storage tanks, must include the above-ground equipment. Although Texaco ultimately offered plaintiff the equipment at no charge above the $700,000 offered by Amoco, it did not do so in writing, nor did it give plaintiff 45 days from the date of its revised offer to accept. Plaintiff argues that Texaco must now make the offer in writing and give plaintiff a new 45-day period to consider it. Defendants claim that the statute requires Texaco only to make the same offer as it received from Amoco.

A right of first refusal is a right to buy on the same terms offered by a third party. Subsection II of § 2802(b)(3)(D)(iii) clearly requires Texaco to do no more than it has done with respect to the portion of the premises that Amoco offered to buy.

If a franchisor need do no more than that, however, in a case where the third-party offeror has not offered to buy all the equipment that makes the property viable as a service station, then the protection that Congress intended to accord franchisees under the Act will come to nought. The Act aims to protect franchisees from abuse of the franchisor's superior bargaining power. S.Rep. No. 731, *supra,* at 17–18, *reprinted in* 1978 U.S.Code Cong. & Admin.News 873, 876. If a franchisor were to engage in such abuse, it might force the franchisee either to replace usable equipment at great expense or to pay the franchisor an above-market price for the existing equipment.

On the other hand, if the franchisor were required always to "throw in" the equipment for free, even in instances where it had a high intrinsic value, the franchisee would get a windfall. Moreover, such an interpretation of subsection II would distort the meaning of Congress's deliberately chosen phrase, "right of first refusal," beyond recognition.

There simply is no third-party offer to buy the above-ground equipment of which Texaco can give plaintiff a right of first refusal. Subsection II therefore does not apply to that portion of the franchisor's interest in the premises. Rather, as to that property the franchisor must make the franchisee a "bona fide offer" under subsection I. This holding best comports with the structure and language of the statute, which gives the franchisor the option either to make "a bona fide offer" or, "*if applicable,* [to offer] the franchisee a *right of first refusal* of at least 45 days duration *of an offer, made by another....*" 15 U.S.C. § 2802(b)(3)(D)(iii) (emphasis added). *See Ballis v. Mobil Oil Corp.,* 622 F.Supp. 473, 475 (N.D.Ill.1985).

A "bona fide offer" under subsection I gives the franchisee the right to purchase

the relevant property (here, the above-ground equipment) at fair market value. *See, e.g., Tobias, supra,* at 1174; *Brownstein v. Arco Petroleum Products Co.,* 604 F.Supp. 312, 315 (E.D.Pa.1985). Where the equipment, like that at issue here, has no resale value, its "fair market value" is $0.

There is no requirement under subsection I that a bona fide offer be in writing. Nor does that subsection mandate a 45–day acceptance period. Texaco's oral offer to sell the above-ground equipment at no charge was open for a reasonable period of time. Texaco therefore fully complied with the Act.

Plaintiff's motion for preliminary injunction is denied, and the complaint is dismissed.

So ordered.